I concur with the affirmance of the summary judgment as to Niagara Machine and Tool Works and Modern Machinery Associates, Inc. I dissent as to the reversal of the summary judgment as to Howell Redwine, Ronnie Alley, and Sidney Morgan.
Johnson had knowledge and appreciation of the dangers associated with placing his hand into the operating press, as shown by his deposition testimony:
 "Q. Mr. Johnson, how far into the press did you have to put your hand in order to get the scrap out?
"A. Five, six inches.
 "Q. And, I guess you could tell when you put it in there that it was up under the ram, the portion of the press that came down?
"A. Yes, sir.
 "Q. And, I guess you knew prior to the accident what would happen if the ram came down while your hand was in there, didn't you?
"A. Yes. *Page 95 
 "Q. You knew that would hurt your hand bad, didn't you?
"A. Yes."
With this knowledge and appreciation of the danger, Johnson, before his injury, removed the barrier guard that had separated him from the press:
 "Q. Okay. Was there any kind of barrier or guard, Mike [Johnson], in place between where the operator stood in front of the controls and the ram of the press?
"A. Yes.
"Q. Tell me about that. What did it look like?
"A. A big screen, rectangle-shaped guard.
". . . .
 "Q. Okay. Could the operator take that barrier down if he wanted to?
"A. Yes, sir.
". . . .
 "Q. On the night of your accident, Mike, when you first started running the press, was that barrier up there in between where you were and the ram of the press?
"A. The guard?
"Q. If you want to call it that.
"A. Yes, sir.
 "Q. Was that barrier up there at the time of your accident?
"A. No, sir.
"Q. Where was it?
"A. Laying on the floor.
 "Q. Had you removed it and put it on the floor behind you?
"A. Yes."
I can find no evidence in the record of any need or reason for Johnson to remove this safety guard in order to operate the press.
There is a factual question as to whether Johnson could have injured his hand if the barrier had been in place; however, from viewing the videotape of the press that was viewed by the trial court, I think it evident that the barrier guard would have made it more difficult for Johnson to place his hand in the press and would have required the use of the hand tool or, at the least, would have made the removal of the scrap easier with the hook hand tool. Defendant Sid Morgan, in answer to questions from Johnson's counsel, testified as follows in his deposition:
 "Q. When the guard, the barrier guard was on the press, was it situated so as to prevent entry of a hand into this point of operation, where Mike Johnson's amputation occurred?
 "A. When barrier guards are on those presses, they are intended to prevent entry of a hand into the point of operation, yes, sir.
 "Q. All I'm asking is, was this barrier guard located there at this particular point of operation, where if it had been on, it would have obstructed his hand from going in?
 "A. If it had been on at that point in time, yes, sir, it would have prevented it.
". . . .
 "Q. Is it your understanding that when the guard is affixed to this press in the manner you have described, that it would be effective in preventing an injury of the type Michael Johnson had, from entry into this point of operation?
"A. As I understand it, yes, it would.
 "Q. In order to remove the tail stock from the point of operation, is it necessary to remove this guard?
"A. No, sir.
 "Q. How can that be accomplished with the guard on?
 "A. To follow the established procedure by picking up the removal hook, reaching around the end of the guard, reaching to the tail stock, hooking the point of the hook into a hole that is in each piece of tail stock and pulling it from the die set, allowing it to fall into the discharge chute.
 "Q. Is it possible to reach around the barrier guard and put your hand in the point of operation?
"A. Not in my opinion, no, sir.
 "Q. Why is it possible to reach around the barrier guard and put a hook in the point of operation, but it is not possible to reach around the barrier *Page 96 
guard and put a hand in the point of operation?
 "A. Because the hook extends one's reach approximately eighteen inches to two feet. The proximity of the die set is such with the barrier guard in place, that it was not reachable in my opinion by the bare hand."
Therefore, if Johnson had not removed the barrier guard, it would have been more difficult for Johnson to have injured his hand, if he could have injured his hand at all. By removing the barrier guard for no articulated reason, Johnson, with knowledge and appreciation of the danger, exposed himself to a dangerous condition.
In addition to this, Johnson, at the time of his accident, failed to use the hook that press operators were supposed to use in lieu of placing their hands anywhere near the point of operation of the press. Johnson testified in deposition:
 "Q. What was said about safety that you remember during that meeting that took place the night of your accident?
"A. To be careful, to use your hooks.
". . . .
 "Q. All right. And I guess that was Ronnie [Alley, a defendant] that urged everybody to use their hooks, is that right?
"A. Yes, sir.
 "Q. All right. And prior to the time that Ronnie mentioned using those hooks, had you ever seen those hooks out there?
"A. Yes, sir.
"Q. All right. Had you ever used them?
"A. On occasion.
 "Q. All right. When did you use them, how would you use them?
"A. To pull a piece of scrap out.
 "Q. Okay. Pull a piece of scrap out after your press had operated and pressed out a plate?
"A. Yes, sir.
". . . .
 "Q. And Mr. Ronnie Alley sitting down to my right also, he never gave you any warnings or reprimands regarding any of your work practices there at Birmingham Bolt prior to your accident?
"A. Yes, sir.
"Q. What did he say to you?
 "A. The night of my accident, he said use hooks, that was the only thing he discussed.
"Q. He told you that the night of your accident?
"A. Yes, sir.
 "Q. And you were not at the time of your accident using a hook, were you?
"A. No, sir.
". . . .
 "Q. What about the hook, Mike [Johnson], was the hook there, too, at the time of your accident?
"A. Yes.
"Q. Was it behind you also next to the barrier?
"A. No, sir.
"Q. Where was the hook?
"A. Lying right in front of me."
Thus, at the time of his accident, Johnson had personally removed the barrier guard that was designed to keep press operators, such as Johnson, from getting their hands near or into the point of operation of the press. In addition, for whatever reasons, Johnson had elected not to use the hook handtool "lying right in front" of him, even though use of the hooks had been stressed at a safety meeting attended by Johnson on the very night of his accident.
Mr. Stanton Cheyney, an expert witness on presses, testified as follows regarding these actions by Johnson:
 "Q. And it's correct, isn't it, Mr. Cheyney, that while operating a press, a press operator should never remove barrier guards that have been placed there to protect him from the point of operation of a press?
"A. That is true.
 "Q. The removal of a safety guard from the press is not, is it, a safe and prudent action for a press operator to do while operating the press?
"A. That is true.
 "Q. You would agree, wouldn't you, that the removal of a safety guard put *Page 97 
there for the protection of the worker is not a reasonable and safe practice for an operator while he's running an E 150 press?
"A. I would agree.
 "Q. Now finally, Mr. Cheyney, the use of hand tools by a press operator is a recognized and recommended safety practice in certain applications, correct?
"A. True.
 "Q. And the use of hand tools as a practice would help prevent and avoid accidents such as this one, correct?
"A. True.
 "Q. And if hand tools had been used properly by the press operator in this case his injury would not have occurred, correct?
MR. KIRBY: Object.
"A. True.
 "Q. And would you agree, Mr. Cheyney, that it is always a good practice from the standpoint of safety for a press operator to use his hand tools as instructed in operating a press?
"A. Absolutely."
Johnson's removal of the barrier guard and his failure to use the hook handtool not only contributed to, but directly caused, his injury.
Johnson's cryptic description of the accident fails in any way to justify or explain his actions of removing the safety guard, failing to use the hook, or placing his hand into the point of operation of a 120,000-ton pressure press operating at a rate of almost 60 strokes per minute. At his deposition, Johnson testified as follows:
 "Q. . . . Now, tell me how your accident happened.
"A. I was running the press.
"Q. Okay.
 "A. Steel come to an end. I hit the stop button, stuck my hand in there. It cut it off.
"Q. Why did you put your hand in there?
"A. To bring out the scrap."
Unless we are to overrule cases recently decided by this Court, e.g., Rowden v. Tomlinson, 538 So.2d 15 (Ala. 1988) (applying the "substantial evidence" doctrine); Fenley v.Rouselle Corp., 531 So.2d 304 (Ala. 1988); Wallace v. Doege,484 So.2d 404 (Ala. 1986), we must conclude that Johnson's failure to exercise reasonable care in operating the press, coupled with his knowledge of the obvious danger, renders him contributorily negligent as a matter of law.
Therefore, I would affirm the trial court's summary judgment on behalf of all defendants.
MADDOX and STEAGALL, JJ., concur.