On April 15, 1988, Dwight Livingston injured his leg while attempting to raise the gantry of a Koehring model 455S lattice-boom crane at a construction site in *Page 1355 
Coffeeville, Alabama. A gantry is the A-frame structure on the rear of a crane that supports the suspension cables running from the crane to the boom; the purpose of the gantry is to control the boom height. NewMc Construction Company, Livingston's employer, owned the crane.
When this kind of crane is transported, the boom is disassembled and the gantry is lowered to permit it to clear obstructions such as bridge overpasses. When the gantry is in the lowered position, it is incapable of falling, because it has "stops" underneath it. When the crane is set up at a jobsite, the boom is reassembled and the gantry is raised to its highest position. The gantry also has an intermediate position that allows the crane to be moved short distances without disassembling the boom.
Livingston contends that he did not know of the intermediate position, but knew only of the low and high positions. Livingston claims that on the day of his accident the gantry appeared to be in its lowest position; in fact, it was in the intermediate position. Livingston was trying to raise the gantry by kneeling on the counterweight between the struts of the gantry. He removed one pin and then hammered out the second pin; as soon as the second pin fell out, the gantry collapsed on Livingston's left leg, causing severe injuries.
Livingston had spent over 20 years in construction, where he worked either with or around cranes, including 6 years operating different kinds of lattice-boom cranes, including Koehring, Northwest, Lima, Manitowoc, and Loraine cranes. In addition, Livingston had observed pins being removed from gantries on many occasions, and he had also assisted other people who raised and lowered gantries.
Livingston's complaint alleged that the crane was defective in its design, instructions, and warnings; Livingston sought relief from Koehring under theories of negligence and wantonness and under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). The wantonness claim was dismissed on Koehring's motion for directed verdict, and the case was submitted to the jury on theories of negligence and AEMLD. The jury returned a $500,000 verdict for Livingston. Koehring appealed, seeking reversal on four grounds.
First, Koehring contends that the trial court erred in failing to grant its motion for a directed verdict on the ground that Livingston had failed to prove an essential element of his AEMLD claim, namely that the crane was defective and unreasonably dangerous to the ordinary user. Casrell v. AltecIndustries, Inc., 335 So.2d 128, 133 (Ala. 1976).
In order to prove prima facie liability under the AEMLD, Livingston must show:
 "(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
 "(a) the seller is engaged in the business of selling such a product, and
 "(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 "(2) Showing these elements, the plaintiff has proved a prima facie case although
 "(a) the seller has exercised all possible care in the preparation and sale of his product, and
 "(b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller."
335 So.2d at 132-33. Liability under the AEMLD turns upon whether a product is unreasonably dangerous when put to its intended use. 335 So.2d at 133. The evidence showed that Koehring manufactured and sold the crane that injured Livingston, that Koehring was engaged in the business of selling such a product, and that the crane reached the ultimate user, Livingston, without substantial change in its condition.
Of course, the question of whether a product is unreasonably dangerous is for the trier of fact to decide. Casrell,335 So.2d at 133. Livingston's primary argument *Page 1356 
against Koehring was that it had failed to follow basic design principles in designing the gantry. All of the experts who testified in this case agreed that certain basic design principles are applied to the design and manufacture of products intended to be used by humans. The experts agreed that any reasonably competent design engineer follows these design principles:
He considers the use of the product in the environment in which it will be used and identifies potential, reasonably foreseeable, safety hazards that might arise while a person uses the product. The design engineer should design identified potential hazards out of the product, if it is possible to do so without defeating the purpose of the product, or if to do so would not make the cost of the product exorbitant. If the hazards cannot be eliminated by design, the design engineer should next consider appropriate guards. If residual danger can be guarded against without adversely affecting the product's intended use or marketability, then good design engineering requires the installation of guards. Finally, if a safety hazard cannot be eliminated by design or guards, then a warning must be provided to the user.
Livingston's expert testified that there were defects in this crane that would have been eliminated by generally accepted design principles. In other words, the expert said the design itself created the hazard that resulted in injury to the user, Mr. Livingston. Specifically, the expert testified that "the design that is incorporated in this product is an entrapment to the operator and it would be very dangerous for the operator to use this particular configuration." He explained the basis of his opinion:
 "Well, the basis is that it appears from all the evidence as far as looking at this, it is a two position, up and down, there are two holes on the outer sheave. The sheave hides the position of the inner hole so you cannot tell by looking whether it's in the lower position or it could be the fully raised position or the lowered position. You cannot tell if it is in the intermediate position.
 "If it happens to be in the intermediate position which the manufacturer says is perfectly acceptable to transport it in the intermediate position, it happens to come to the job site in that position and the person who is going to erect the boom does not know that and he pulls the pin out, then this gantry is going to fall about a foot or so. And in the process a man is going to have to be standing right there in the area where he could be caught by this pinch point while he is removing those pins. That is the logical place to stand because right there is where Mr. Livingston was standing or squatting down at the time.
". . . .
 "Q. Based on those things and those materials, do you have an opinion that you can state as to whether a reasonably prudent design engineer should design a gantry raising and lowering system such as this one you just talked about?
 "A. Yes, sir. It is my opinion that a design engineer that would design in that manner is not considering the aspect of safety for the user, sir. And that is an incorrect design."
The expert went on to testify that it was feasible to design the hazard out of the product and that, as designed, the product was unreasonably dangerous.
First, Koehring contends that even if he is able to show that the crane was defective, Livingston cannot recover under the AEMLD because, Koehring argues, the evidence shows, that as a matter of law, Livingston lacked knowledge common to the community of ordinary users who, Koehring argues, recognize the position of the gantry and understand the ramifications of attempting to raise it while in that position. Thus, Koehring contends that Livingston, as a matter of law, is not a member of the community of users that Koehring reasonably expected to use its product. Koehring points out that the record is devoid of any evidence that Livingston's lack of knowledge was typical of ordinary users. It argues that because Livingston did not possess knowledge that, *Page 1357 
arguably, is known to ordinary users, he was not, as a matter of law, an "ordinary user," as this Court has held one must be in order to recover under the AEMLD.
Because Livingston had been a crane operator for 6 years, had spent over 20 years in construction, had observed pins being removed from gantries, and had assisted others who raised and lowered gantries on a regular basis, we cannot say that, as a matter of law, Livingston does not fall within the category of "ordinary user" of this product. Under the facts presented here, the jury could reasonably conclude, as it did, that Livingston was within the community of users that Koehring reasonably should have expected to use the crane when Koehring was designing, manufacturing, and selling it. We hold, therefore, that Livingston presented sufficient evidence to go to the jury on the question of whether he was an "ordinary user" of the product involved in this AEMLD suit.
Second, Koehring contends that George Green, offered by Livingston as an expert witness, was not competent to testify as an expert on the reasonable expectations of ordinary users of the Koehring 455S gantry system.
 "To qualify as an expert, the witness must have such knowledge, skill, experience or training, as that his opinion will be considered in reason as giving the trier of fact light upon the question to be determined. The question of whether or not a particular witness will be allowed to testify as an expert is largely discretionary with the trial court, whose decision will not be disturbed on appeal except for palpable abuse."
Gamble, McElroy's Alabama Evidence, § 127.01(5)(b) (4th ed. 1991).
 " 'An individual might be qualified as an expert witness by his study, practice, experience, or observation.' "
Ward v. Dale County Farmer's Co-op, Inc., 472 So.2d 978 (Ala. 1985), quoting Gullatt v. State, 409 So.2d 466, 472
(Ala.Cr.App. 1982). Green's education and experience in product design and safety engineering qualify him as an expert on the reasonable expectations of ordinary users of the Koehring 455S gantry system.
Third, Koehring argues that its motion for directed verdict should have been granted on the grounds of contributory negligence. In order to establish a prima facie defense of contributory negligence, Koehring must show that Livingston:
 "(1) had knowledge of the condition; (2) had an appreciation of the danger under the surrounding circumstances; and (3) failed to exercise reasonable care, by placing himself in the way of danger."
Wallace v. Doege, 484 So.2d 404, 406 (Ala. 1986), quoting Brownv. Piggly-Wiggly Stores, 454 So.2d 1370, 1372 (Ala. 1984). Because there was no evidence that Livingston knew of or appreciated any danger, the trial court properly denied Koehring's motion for directed verdict.
Last, Koehring argues that the trial court erred by refusing to allow any testimony from witness Deborah Johnson, on redirect examination, for the purpose of stating the nature of a pending lawsuit against Livingston, and for the purpose of producing evidence regarding Livingston's alleged physical abilities after his injury.
Livingston's counsel had filed a motion in limine that anticipated Koehring's attempt to introduce evidence about a pending lawsuit against Livingston concerning sexual harassment of Johnson. At the hearing on the motion in limine, the trial court decided to allow Koehring to examine Johnson about Livingston's abilities after the accident, but prohibited Koehring from inquiring about the sexual harassment suit. The trial court noted that if Koehring sought to impeach Livingston through Johnson's testimony, then Livingston would be allowed on cross-examination to explore any bias or prejudice Johnson might have against Livingston. On cross-examination, Livingston's counsel did not mention allegations of sexual harassment, but only brought out evidence indicating bias.
Furthermore, Koehring failed to elicit any testimony from Johnson during direct examination about the alleged incident showing Livingston's physical abilities after his injury, and Livingston did not raise *Page 1358 
this topic during cross-examination; therefore, Koehring waived its opportunity to raise it on redirect examination.
 " '[O]n redirect examination, the object is to answer any matters brought out on the cross-examination of the witness by his adversary. Whether, on redirect examination, a party may elicit from his witness matters which do not rebut that which was brought out on cross-examination is within the discretion of the trial court.' "
Campbell v. State, 508 So.2d 1186, 1188-89 (Ala.Cr.App. 1986); see Gamble, McElroy's Alabama Evidence, § 439.01(1) (4th ed. 1991).
For the foregoing reasons, the trial court is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
MADDOX, J., concurs in the result.