652 So.2d 211 (1994)
Vernda Kay HICKS, as administratrix of the Estate of John William Hicks, deceased
v.
COMMERCIAL UNION INSURANCE COMPANY, et al.
1921934.
Supreme Court of Alabama.
August 26, 1994.
Rehearing Denied December 16, 1994.
*213 Bayless E. Biles of Wilkins, Bankester, Biles & Wynne, Bay Minette, L.A. Marsal of Seale, Marsal & Seale, Mobile, for appellant.
*214 Vaughan Drinkard, Jr. and Winn Faulk of Drinkard, Ulmer & Hicks, Mobile, for Thaxton, Inc. and Hy-Tech Machine, Inc.
Vincent A. Noletto, Jr. and Thomas H. Nolan, Jr. of Brown, Hudgens, P.C., Mobile, for Commercial Union Ins. Co. and Samuel Flood.
PER CURIAM.
Vernda Kay Hicks, as administratrix of the estate of John Williams Hicks, appeals from a summary judgment in favor of the defendants Thaxton, Inc., Hy-Tech Machine, Inc., Samuel Flood, and Commercial Union Insurance Company. Vernda Hicks brought this action for damages against these four defendants and against three co-employees of John Hicks,[1] alleging negligence, intentional or willful wrongful conduct, and liability under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), in connection with the discharge of a pipe plug or pipe stopper, attached to a highly pressurized container or vessel, which struck John Hicks in the head, killing him instantly. With regard to Thaxton, Inc., and its "affiliate," Hy-Tech Machine, Inc. (together referred to hereinafter as "Thaxton"), Vernda Hicks alleged that the pipe stopper and its component parts, which Thaxton had designed and manufactured, were "defective," as that term is used in our cases applying the AEMLD. With regard to Samuel Flood and his employer, Commercial Union Insurance Company, Vernda Hicks alleged that Commercial Union, through Flood, had breached a duty to exercise reasonable care to ensure safety during the testing of the vessel, during which testing John Hicks was killed.
The issues are (1) Whether a genuine issue of material fact exists as to whether the pipe stopper was defective; (2) Whether a genuine issue of fact exists as to whether the condition of the pipe stopper had been substantially altered when it was used in the testing of the vessel; (3) Whether the evidence indicated that John Hicks was contributorily negligent as a matter of law; (4) Whether it indicated that John Hicks voluntarily assumed the risk of death, as a matter of law; and (5) Whether the plaintiff presented substantial evidence that Commercial Union and its agent Flood had assumed a duty to exercise reasonable care to inspect the pipe stopper for safety.
A summary judgment is proper only when the court concludes that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law, Rule 56, Ala.R.Civ.P. On a motion for a summary judgment, when the movant makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. Rule 56(e); § 12-21-12, Ala.Code 1975. The court views the evidence most favorably to the nonmovant and resolves all reasonable doubts concerning the existence of a genuine issue of material fact against the movant. Specialty Container Mfg., Inc. v. Rusken Packaging, Inc., 572 So.2d 403, 404 (Ala. 1990).
John Hicks had been employed by Taylor-Wharton/Plant City Steel Company ("Taylor-Wharton") and its predecessor Union Carbide since 1977. Taylor-Wharton manufactures boilers or "vessels," which store pressurized gasses such as oxygen, nitrogen, and hydrogen. John Hicks conducted hydrostatic pressure tests of vessels manufactured by Taylor-Wharton.
In a hydrostatic pressure test, water is placed into the vessel being tested, and the vessel is then pressurized to determine whether the vessel properly maintains its structural stability under such pressure. During such a test, the vessel is inspected for leaks and other conditions that may affect its compliance with standards of the Boiler and Pressure Vessel Code ("Code") of the American Society of Mechanical Engineers ("ASME"); such compliance is necessary for the manufacturer to obtain ASME certification of its vessel. The vessel John Hicks was testing when he was killed had been designed and manufactured to meet ASME standards.
*215 For a vessel to receive ASME certification, which signifies that a vessel complies with ASME standards, a representative of an authorized ASME inspection agency must be present at the testing of the vessel. Commercial Union was an authorized inspection agency; under a written contract between it and Taylor-Wharton, Samuel Flood, an inspector employed by Commercial Union, regularly witnessed the testing of vessels manufactured by Taylor-Wharton at Taylor-Wharton's manufacturing facility.
On May 15, 1990, Michael Onderdonk, a Taylor-Wharton employee, prepared a 6,000-gallon vessel for testing by the next work shift. When the shift changed, Onderdonk left, and Hicks arrive to conduct the hydrostatic test. Pursuant to the ASME Code, John Hicks began the test by pressurizing the vessel to 433 pounds per square inch. Samuel Flood was present, along with Lee Hull, another Taylor-Wharton employee. After about two minutes, a pipe stopper on the vessel dislodged and shot toward John Hicks, who at that moment was walking in front of it. The pipe stopper, which weighed 2.8 pounds, was travelling 71 feet per second when it struck John Hicks in the head; it went through John Hicks's hard hat, killing him instantly.
Pipe stoppers cover the opening of pipes extending from vessels for the purpose of pressurizing vessels for testing. A pipe stopper contains four "jaws," which secure the pipe stopper to the pipe extending from the vessel by expanding with increased pressure. As the pressure increases, the jaws expand and grip the inside of the pipe. The jaws are manufactured in sets. Although the jaws within a set are apparently uniform in size, the size of the jaws of different sets varies slightly. Because these sets of jaws differ slightly in size, the jaws of a set are all marked by the same letter, e.g., "A," "B," or "C." The jaws easily detach from the pipe stopper itself, and the jaws of different sets are interchangeable. An "o-ring" and a neoprene seal hold the jaws on the pipe stopper. The o-ring and the seal deteriorate with use, and the pipe stopper is designed to permit their replacement. Thaxton markets "o-ring kits" to replace the o-ring and the seal after they deteriorate. To replace the o-ring and the seal, it is necessary to remove the jaws from the pipe stopper.
The circuit court entered a summary judgment in favor of all of the defendants. With regard to the AEMLD claims against Thaxton, the circuit court held that Vernda Hicks had failed to present substantial evidence 1) that the pipe stopper was defective; 2) that the condition of the plug had not been substantially altered; and 3) that Thaxton had failed to adequately provide certain warnings. The circuit court held further that John Hicks had been contributorily negligent, as a matter of law; that John Hicks had assumed the risk of death, as a matter of law; and that the doctrine of res ipsa loquitur was not applicable to these facts. With regard to the claims against Flood and Commercial Union, the circuit court held that in Commercial Union's contract with Taylor-Wharton to provide inspection services, Commercial Union had not assumed a duty to ensure that the testing of vessels was conducted safely.

I. The Claims Against Thaxton and Hy-Tech
In arguing that the circuit court erred in entering the summary judgment in favor of Thaxton and Hy-Tech as to her AEMLD claim, Vernda Hicks contends first that a genuine issue of material fact exists as to whether the pipe stopper was "defective" within the terms of the AEMLD.
In order to establish liability under the AEMLD, a plaintiff must show the following:
"(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
"(a) the seller is engaged in the business of selling such a product, and
"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."
Kelly v. M. Trigg Enterprises, Inc., 605 So.2d 1185, 1191 (Ala.1992) (quoting earlier cases); Caterpillar Tractor Co. v. Ford, 406 *216 So.2d 854, 855 (Ala.1981). "Liability under the AEMLD turns upon whether a product is unreasonably dangerous when put to its intended use." Koehring Cranes & Excavators, Inc. v. Livingston, 597 So.2d 1354 (Ala. 1992); Casrell v. Altec Indus., Inc., 335 So.2d 128, 133 (Ala.1976). This Court has further stated:
"`The manufacturer of a product which may be reasonably anticipated to be dangerous if used in a way which he should reasonably foresee it would be used is under a duty to exercise reasonable care to give reasonable and adequate warnings of any dangers known to him, or which in the exercise of reasonable care he should have known and which the user of the product obviously could not discover. Reasonable care means that degree of care which a reasonably prudent person would exercise under the same circumstances.'"
Bean v. BIC Corp., 597 So.2d 1350, 1353 (Ala.1992) (quoting Dunn v. Wixom Brothers, 493 So.2d 1356, 1360 (Ala.1986) (quoting Alabama Pattern Jury Instructions (Civil), 32.07, and stating that A.P.J.I. 32.07 was a correct statement of the law)).
In opposition to the summary judgment motion filed by Thaxton, Vernda Hicks submitted the deposition testimony of Fred A. Lewter III and J. Albert McEarchern, Jr., two engineering experts, regarding the Thaxton pipe stopper, its jaws, and the instructions and warnings that accompanied the product. After conducting numerous hydrostatic tests using the pipe stopper and jaws that had failed and led to the death of John Hicks, and other pipe stoppers manufactured by Thaxton, Lewter and McEarchern concluded generally that, although this fact is not readily discernible, the jaws from different sets were not uniform in size; that the jaws were easily detachable from the pipe stopper; that the jaws from different sets were interchangeable; that a pipe stopper with jaws from different sets does not function properly and has a strong propensity to dislodge during a hydrostatic test; that the jaws of the pipe stopper recovered after the accident were mismatched; and that the mismatching of the jaws in the pipe stopper was a cause contributing to the accident. On the basis of these findings, the experts concluded that the pipe stopper was unreasonably dangerous. For example, McEarchern stated:
"[The mismatching of the jaws] was a factor in what caused this plug to come out....
". . . .
"... [T]here is a serious potential for mismatching even if you keep the `E's' and `X's' together. So, there is a definite defect here in the concept of this design in the fact that it is very easy to mix up or confuse these. And nowhere in the instructions does it tell you not to.
". . . .
"... [I]f you had a tool box full of these, I mean these inevitably come apart when you throw them in a box. I mean, it's very easy for this o-ring to come off and I won't do it here or I will end up with them all over the floor. But, it is very easy when you throw these in a tool box for these to become a pile of parts.
". . . .
"... [I]t is very easy to mismatch them.
". . . .
"Unless you are warned not to."
Lewter and McEarchern concluded that Thaxton should clearly and conspicuously mark the jaws so that they would not be easily mismatched and concluded that the instructions accompanying the pipe stopper should be amended to warn against mismatching.
Lewter and McEarchern also concluded that the pipe stopper was unreasonably dangerous because its design did not include a "gag" or safety chain to prevent it from flying loose if it dislodged. Thaxton marketing literature states that gags should be used as an "additional safety precaution" in certain types of pressure testing; however, this literature did not list hydrostatic testing as one of the types in which a gag should be used. Lewter concluded that a gag or safety chain should be attached to the plugs during all types of pressure tests, including hydrostatic tests.
Thaxton argues that the evidence presented does not create a genuine issue of material *217 fact as to whether the pipe stopper was sold in a defective condition.
Relying on Onderdonk's deposition testimony that he properly attached the pipe stopper and did not mismatch the jaws on the pipe stopper before the accident, Thaxton argues, in effect, that the tests conducted by the plaintiff's experts, in which the pipe stopper with the mismatched jaws became dislodged, are not probative or material because, when conducting these tests, the plaintiff's experts did not tighten the hex nut, which attached the pipe stopper to the vessel, with sufficient torque. In their deposition testimony, however, both of the plaintiff's experts concluded that, contrary to the opinion of Thaxton employees, torque applied to the hex nut did not significantly affect the ability of the pipe stopper to hold in place under pressure. Further, the conflict between Onderdonk's testimony that he did not mismatch the jaws in the pipe stopper that later became dislodged and killed John Hicks, and Lewter and McEarchern's testimony that the jaws recovered from the scene of the accident were mismatched simply creates another genuine issue of fact for the jury.
Relying on the operating instructions that accompanied the pipe stopper when it was sold, Thaxton contends that it provided an adequate warning of the risk of harm to which John Hicks was exposed. The relevant part of the operating instructions states:
"BEFORE USE, A SPECIAL WORD OF CAUTIONThaxton, Inc., engineers and manufactures a superior testing product, but pressure testing is generally recognized as an inherently hazardous operation, hence general safety precautions should be observed: check rating and overall condition of all connections, flanges, valves, and other testing equipment against planned testing pressure. Vent all air if hydrostatic testing and provide a remote or automatic pressure control away from the test assembly. Do not stand in front of test plug or other enclosure while the test is in progress."
(Emphasis added.) Because Taylor-Wharton received this warning and because, Thaxton says, a manufacturer may rely on an employer to convey such warnings and instructions to its employees who use the product, Thaxton contends that even if the pipe stopper was defective, as the plaintiff alleged, John Hicks was adequately warned of the danger that led to his death, specifically the danger posed by standing in front of the plug during a test.
Without commenting on the merit of Thaxton's argument that a warning given to an employer is somehow deemed, as a matter of law, to have been given to its employees who use the product, we hold that the testimony presented by the plaintiff's experts at least creates a genuine issue of material fact regarding the adequacy of the warning in the instructions accompanying the pipe stopper manufactured by Thaxton. Whether the provision of the operating instructions warning users not to stand in front of the pipe stopper during a test adequately apprises users of the risk of injury and death presented by the mismatching of the jaws of a pipe stopper is a question of fact for the jury.
Citing Ford Motor Co. v. Rodgers, 337 So.2d 736 (Ala.1976), Thaxton also argues that it had no duty to warn because, it says, the danger that a pipe stopper could become dislodged during a hydrostatic test was common knowledge among the employees of Taylor-Wharton. Thus, Thaxton contends, the presence of the warnings recommended by the plaintiff's experts would not have supplied the users of the pipe stopper with any information that the management and employees of Taylor-Wharton did not already have. Although the testimony of the Taylor-Wharton employees raises an inference that the danger posed by a pipe stopper's slipping loose was commonly known, that evidence does not create an undisputed inference that users of the pipe stopper knew that mismatching the jaws of the pipe stopper would greatly increase the propensity of the pipe stopper to dislodge during a hydrostatic test.
With regard to the issue of defectiveness, Thaxton argues, last, that the pipe stopper is unavoidably unsafe and that Vernda Hicks failed to show how Thaxton could have designed the pipe stopper differently so as to avoid the risk of its failure. This argument, *218 however, ignores the considerable and specific testimony of the plaintiff's experts regarding changes in design that would have eliminated or greatly reduced not only of the risk of failure but also, more importantly, the risk of injury and death.
We conclude that Vernda Hicks presented substantial evidence from which an impartial trier of fact could reasonably infer that the pipe stopper, as manufactured and sold by Thaxton, was "defective" within the terms of the AEMLD.
Vernda Hicks argues also that a genuine issue of fact exists as to whether the condition of the plug used in the hydrostatic test had been substantially altered.
In Sears, Roebuck & Co. v. Harris, 630 So.2d 1018, 1027 (Ala.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2135, 128 L.Ed.2d 865 (1994), the Court stated the following applicable legal principles:
"An essential element of an AEMLD claim is proof that the product reached the consumer without substantial change in the condition in which it was sold. Clarke Indus., Inc. v. Home Indemn. Co., 591 So.2d 458, 462 (Ala.1991); see also Caterpillar Tractor Co. v. Ford, 406 So.2d 854 (Ala.1981). However, the mere fact that a product has been altered or modified does not necessarily relieve the manufacturer or seller of liability. Johnson v. Niagara Machine & Tool Works, 555 So.2d 88, 91 (Ala.1989). A manufacturer or seller remains liable if the alteration or modification did not in fact cause the injury, Johnson, 555 So.2d at 91 (quoting Industrial Chem. & Fiberglass Corp. v. Hartford Acc. & Indemn. Co., 475 So.2d 472, 476 (Ala. 1985)); Bullen v. Roto Finishing Systems, 435 So.2d 1256 (Ala.1983); Brown v. Terry, 375 So.2d 457 (Ala.1979), or if the alteration or modification was reasonably foreseeable to the manufacturer or seller, Clarke Indus., 591 So.2d at 462; Beloit Corp. v. Harrell, 339 So.2d 992 (Ala.1976)."
Thaxton contends that Vernda Hicks did not present sufficient evidence that it sold the pipe stopper with mismatched jaws and that if the pipe stopper that dislodged and killed John Hicks had mismatched jaws, it did so because an employee of Taylor-Wharton had mismatched them. Any such mismatching of the jaws of the pipe stopper, Thaxton argues, constituted a substantial alteration of its product, and that alteration, it says, was not reasonably foreseeable.
No evidence shows that Thaxton sold the pipe stopper to Taylor-Wharton with mismatched jaws. Circumstantial evidence tends to show that the jaws were mismatched at the manufacturing facility of Taylor-Wharton. Although the mismatching of the jaws of the pipe stopper is undisputedly a substantial alteration of the product, a genuine issue of fact exists as to whether that substantial alteration was reasonably foreseeable to Thaxton. Vernda Hicks presented substantial evidence from which an impartial trier of fact could reasonably infer that Thaxton could have reasonably foreseen that the jaws of the pipe stopper could easily be mismatched during the productive life of the product. Thaxton markets "o-ring kits" for the purpose of replacing the pipe stopper's o-ring and neoprene seal when they deteriorate or wear out. Vernda Hicks also produced testimony from George Piel, vice president of Thaxton, who stated:
"Q.... You all advertise the sale of a neoprene seal after the heavy parts of the product reach the user, do you not?
"[Piel]: We sell seal kits, yes, sir.
"Q. Seal kits. And you also advertised the o-ring?
"[Piel]: Yes, sir. That is part of the seal kit.
"Q. Once the o-ring is destroyed or used up for its life expectancy and once the neoprene seal is used up for its life expectancy, is there anything to hold those jaws next to the mandrel so they are not mismatched?
"[Piel]: No, sir."
We hold that Vernda Hicks presented substantial evidence from which an impartial trier of fact could reasonably infer that the alleged substantial alteration, i.e., the mismatching of the jaws, was reasonably foreseeable to the manufacturer Thaxton.
Finally, Vernda Hicks argues that the circuit court erred in entering the summary *219 judgment in favor of Thaxton and Hy-Tech on the ground that John Hicks misused the pipe stopper, was contributorily negligent, and assumed the risk of injuryall, as a matter of law.
"`When asserting misuse as a defense under [the] AEMLD, the defendant must establish that the plaintiff used the product in some manner different from that intended by the manufacturer. Stated differently, the plaintiff's misuse of the product must not have been `reasonably foreseeable by the seller or manufacturer.'" Kelly v. M. Trigg Enterprises, Inc., 605 So.2d 1185, 1192 (Ala.1992) (quoting Edward C. Martin, Alabama's Extended Manufacturer's Liability Doctrine (AEMLD), 13 Am.J.Trial Advoc. 983, 1040 (1990)), quoted in Sears, Roebuck & Co., 630 So.2d at 1028. These principles apply to the use of the product by the plaintiff or the plaintiff's decedent as they do to the use of the product by third parties. Kelly, 605 So.2d at 1192. Ordinarily, whether someone misused an allegedly defective product is a factual issue for the jury. Sears, Roebuck & Co., 630 So.2d at 1028; Kelly, 605 So.2d at 1192; Banner Welders, Inc. v. Knighton, 425 So.2d 441, 448 (Ala.1982); Beloit Corp. v. Harrell, 339 So.2d 992, 997 (Ala.1976).
Thaxton contends that the pipe stopper was misused either by one or more employees of Taylor-Wharton, who altered the pipe stopper by mismatching its jaws, or by John Hicks, who failed to examine the adequacy of the pipe stopper before the test commenced. We hold, however, that there are genuine issues of fact for the jury as to Thaxton's affirmative defense of product misuse. First, there are the issues whether John Hicks or any other employee of Taylor-Wharton misused the pipe stopper by mismatching its jaws and by not inspecting it properly before beginning the test. Second, if a jury finds that another employee of Taylor-Wharton, or John Hicks himself, misused the pipe stopper, then there arises the issue whether these alleged misuses of the product were reasonably foreseeable to Thaxton. Thaxton has simply not conclusively shown that the pipe stopper, if it was not being used properly, was being used in a way that was not reasonably foreseeable.
Vernda Hicks argues also that the evidence fails to show that John Hicks was contributorily negligent as a matter of law. She argues first that contributory negligence is no longer an affirmative defense under the AEMLD after Dennis v. American Honda Motor Co., 585 So.2d 1336 (Ala.1991). However, this Court has decided in General Motors, Inc. v. Saint, 646 So.2d 564 (Ala.1994), and in Campbell v. Cutler Hammer, Inc., 646 So.2d 573 (Ala.1994), that contributory negligence remains an affirmative defense under the AEMLD.
The standard for determining whether a person was contributorily negligent as a matter of law has been stated as follows:
"In order to sustain a finding of contributory negligence as a matter of law, there must be a finding that the plaintiff put himself in danger's way, Mackintosh Co. v. Wells, 218 Ala. 260, 118 So. 276 (1928), and a finding that the plaintiff appreciated the danger confronted, Wilson v. Alabama Power Co., 495 So.2d 48 (Ala.1986); Marquis v. Marquis, 480 So.2d 1213 (Ala.1985); Baptist Medical Center v. Byars, 289 Ala. 713, 271 So.2d 847 (1972); Mackintosh Co. v. Wells, supra. Moreover, it must be demonstrated that the plaintiff's appreciation of the danger was a conscious appreciation at the moment the incident occurred. Marquis v. Marquis, supra; Elba Wood Products, Inc. v. Brackin [356 So.2d 119 (Ala.1978)]. Mere `heedlessness' is insufficient to warrant a finding of contributory negligence as a matter of law. Decatur Light, Power & Fuel Co. v. Newsom, 179 Ala. 127, 59 So. 615 (1912)."
Central Alabama Electric Co-op. v. Tapley, 546 So.2d 371, 381 (Ala.1989), quoted in Smith v. U.S. Construction Co., 602 So.2d 349, 350-51 (Ala.1992); Empiregas, Inc. of Belle Mina v. Suggs, 567 So.2d 271, 273 (Ala.1990).
Viewing the evidence in favor of the nonmovant and resolving all doubts in her favor, we hold that the circumstantial evidence presents a genuine issue of material *220 fact as to whether at the time John Hicks placed himself in danger, he had a conscious appreciation of the danger posed by the possibility that the pipe stopper would dislodge and hit him. Although employees of Taylor-Wharton testified in deposition that employees at the Taylor-Wharton manufacturing facility were commonly aware of the danger of blow-outs, no such blow-out had occurred in more than a decade. Undisputed testimony showed that John Hicks conducted on average of two tests each working day. The circumstantial evidence does not conclusively show that John Hicks specifically appreciated the risk of harm or death at the time of the accident. Evidence of mere heedlessness is alone insufficient to warrant a finding of contributory negligence as a matter of law.
Last, Vernda Hicks argues that a genuine issue of fact exists as to whether John Hicks assumed the risk of harm or death as a matter of law. We acknowledge that in defining the affirmative defense of assumption of the risk under the AEMLD, the cases have not been altogether consistent and that in some cases the Court has intimated that assumption of the risk is a form of contributory negligence. However, for purposes of this appeal, we resort to the definition of assumption of the risk stated in Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976):
"`If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.'"
335 So.2d at 143 (quoting Restatement (Second) of Torts § 402A, comment n (1965). In an AEMLD action, whether the injured person assumed the risk of injury or death is ordinarily a question of fact for the jury. Atkins, 335 So.2d at 143.
Thaxton contends that, considering John Hicks's knowledge of and his long experience with the hydrostatic testing, the Court must concluded that, as a matter of law, John Hicks assumed the risk of injury by standing in front of the pipe stopper during the test. We hold, however, that the circumstantial evidence presented by Vernda Hicks and Thaxton creates a genuine issue of material fact as to whether, at the time of the accident, John Hicks was specifically aware of the danger posed by the pipe stopper and whether he voluntarily and intelligently assumed the risk of death by standing in front of the pipe stopper during the test.
We conclude, therefore, that genuine issues of material fact exist as to the affirmative defenses of product misuse, contributory negligence, and assumption of the risk, asserted by Thaxton and Hy-Tech.

II. The Claim Against Commercial Union and Flood
With regard to the claim of negligence against Commercial Union and Flood, the issue is whether in its contract with Taylor-Wharton, Commercial Union and its agent Flood assumed a duty to inspect the pipe stopper to determine whether it was properly secured to the vessel and that its jaws were not mismatched.
Vernda Hicks argues that under the terms of the inspection agreement between Taylor-Wharton and Commercial Union and provisions of the ASME Code incorporated therein, Flood, as the agent of Commercial Union, had a duty to inspect the pipe stopper before the commencement of the hydrostatic test. In addition to the terms of the inspection services contract and the ASME Code, Vernda Hicks also relies on the deposition testimony of Wayne McCain, an expert who testified that under the ASME Code Flood had a duty to inspect the pipe stopper. Commercial Union argues generally that under the terms of the contract itself and in accordance with the testimony of its own experts, Flood had no duty as its agent to inspect the pipe stopper. Commercial Union insists that, although Vernda Hicks wants to characterize Flood as a safety inspector, under the terms of the contract and the ASME Code the duty of Commercial Union and Flood to inspect extended only to determining whether a vessel met ASME standards of quality.
Vernda Hicks relies implicitly on the following general, common law principle:
"`Alabama clearly recognizes the doctrine that one who volunteers to act, though under no duty to do so, is thereafter *221 charged with the duty of acting with due care and is liable for negligence in connection therewith.'"
Columbia Engineering Int'l, Ltd. v. Espey, 429 So.2d 955, 966 (Ala.1983) (quoting Dailey v. City of Birmingham, 378 So.2d 728, 729 (Ala.1979)).
Because there was before the Court no evidence that during testing at the Taylor-Wharton facility Commercial Union or its agents ever actually inspected vessels, pipe stoppers, or any other testing equipment for safety, Vernda Hicks must show that Commercial undertook to do so under the provisions of its contract with Taylor-Wharton.
Under the contract between Taylor-Wharton and Commercial Union, Commercial Union agreed to
"provide manufacturer, at the fabricating facility listed above or at the vendor's premises or field erection sites, inspection services meeting the requirements of the Boiler and Pressure Vessel Code of the American Society of Mechanical Engineers, hereinafter referred to as the `Code,' and the requirements of the National Board of Boiler and Pressure Vessel Inspectors for Shop Inspection, Testing and Certification."
Section UG-99 of the ASME Code deals with the conduct of a "standard hydrostatic test." Vernda Hicks bases her argument in part on paragraph (j) of § UG-99:
"(j) Before applying pressure, the test equipment shall be examined to see that it is tight and that all low pressure filling lines and other appurtenances that should not be subjected to the test pressure have been disconnected."
(Emphasis added.)
Vernda Hicks submitted the expert testimony of Wayne McCain, who concluded that Flood was negligent in allowing the hydrostatic test to proceed with a defective pipe stopper. McCain testified also that a pipe stopper attached to a vessel during a hydrostatic test is at the time of the test a part of the vessel and that, therefore, the pipe stopper that killed John Hicks should have been inspected by Flood before the test.
Commercial Union contends that Taylor-Wharton, not Flood, was responsible for examining the vessel. Commercial Union and Flood submitted expert testimony indicating that Flood was not a "safety inspector" for Taylor-Wharton and indicating that his sole responsibility was to inspect Taylor-Wharton boilers and vessels for compliance with ASME standards of quality. Commercial Union and Flood also submitted testimony that Taylor-Wharton, not Flood, was responsible for employee safety during the hydrostatic tests.
Because Commercial Union contractually undertook to provide inspection services to Taylor-Wharton in accordance with the ASME Code, the provisions of the ASME Code determine whether Commercial Union had a duty to inspect the pipe stopper.
The ASME Code variously states the respective duties of both the manufacturer and the inspecting authority. Paragraph (j) of § UG-99, however, does not stipulate whether the manufacturer or the inspector has the duty to examine the test equipment and determine that it is "tight" before pressurizing the vessel for the test. Because the ASME Code does not clearly specify whether the manufacturer or the inspector must perform the examination provided by paragraph (j) and because it is not clear whether the duty to examine the vessel to determine that it is "tight" encompasses a duty to inspect pipe stoppers, we hold that the conflicting expert testimony on this issue submitted by Commercial Union and Vernda Hicks creates a genuine issue of material fact as to whether Commercial Union and Flood owed the alleged duty of reasonable care. Therefore, the summary judgment was improper as to Commercial Union and Flood.
As to the affirmative defense of contributory negligence asserted by Commercial Union and Flood, we conclude, as we have concluded with regard to Thaxton's assertion of this defense, that the circumstantial evidence is insufficient to warrant a finding that John Hicks was contributorily negligent as a matter of law.
Based on the foregoing, we reverse the summary judgment in favor of Thaxton, Inc., *222 Hy-Tech Machine, Inc., Commercial Union, and Flood.
REVERSED AND REMANDED.
MADDOX, ALMON, SHORES, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
INGRAM, J., concurs in the result.
HORNSBY, C.J., and COOK, J., concur in part and dissent in part.
INGRAM, Justice (concurring in the result).
I concur in the result reached by the majority in this case. It is clear that there are several genuine issues of material fact concerning Mr. Hicks's death that must be resolved by the jury. However, I disagree with the principles outlined in the majority's discussion of the affirmative defenses available to Thaxton relating to Mr. Hicks's interaction with the plug.
Contrary to the majority's opinion, I believe that Thaxton should not be allowed to assert contributory negligence as a defense to Mrs. Hicks' AEMLD claim. Further, I believe that the majority, in its discussion of the product misuse defense, should have noted the important issue of the manufacturer's intention. Finally, the majority, while quoting the definition of the assumption of the risk defense given in Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976), does not address the reasonableness of Mr. Hicks's actions in encountering the dangerous plug; it is my opinion that the plaintiff's reasonableness is an essential element of the assumption of risk defense under the AEMLD.

Contributory negligence as an AEMLD affirmative defense
In Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976) and Atkins, supra, the Court produced the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). In those cases, the Court attempted to develop a products liability doctrine that would "level the playing field" for consumers attempting to recover for injuries resulting from defective products. For far too long in Alabama, delinquent manufacturers of defective products were shielded by the problems that warranty and negligence law posed for injured consumers seeking recompense. The complexities of discovery and proof in products liability cases, particularly in negligence cases, made proving the manufacturer's liability almost insurmountably difficult. These difficulties grew with the advent of mass media advertising and subtle merchandising, wherein manufacturers convey a sense of safety and quality to consumers who rely upon those manufacturers to produce safe, nondefective products.
In retrospect, it is clear that the Atkins court did not go far enough in its efforts to protect the consumers of Alabama from unreasonable risks occurring from inferior products. The Atkins Court, although basing the AEMLD upon Restatement (Second) of Torts § 402A (1965), retained the concept of fault-based recovery through its theory of "negligence as a matter of law"; that is, the sale of a defective product is itself indicative of negligence on the manufacturer's part. That theory alone would not have tainted Alabama's products liability law.[2] However, this Court's subsequent interpretations of Atkins have left open a corridor for manufacturers to maintain the contributory negligence defense as a total bar against recovery. See General Motors Corp. v. Saint, 646 So.2d 564 (Ala.1994) (Ingram, J., dissenting); Campbell v. Cutler Hammer, Inc., 646 So.2d 573 (Ala.1994) (Ingram, J., dissenting). The Saint and Cutler Hammer cases threaten the *223 progressive step taken by the Court in Dennis v. American Honda Motor Co., 585 So.2d 1336 (Ala.1991), whereby contributory negligence relating to accident causation was held as an invalid AEMLD defense. This is so, even though the Atkins Court noted that AEMLD permitted the contributory negligence defense only "in proper cases (e.g., plaintiff's misuse of the product)." Atkins, 335 So.2d at 143 (emphasis added).
As I stated in my dissent in Saint, I believe that the doctrine of contributory negligence should be abandoned as a viable defense in products liability cases. While I believe that contributory negligence is a severely outmoded concept when applied in ordinary negligence cases, see Simmons v. Central Concrete Products Co., 619 So.2d 1335 (Ala.1993) (Ingram, J., dissenting), it is even more clear that there should be no place for contributory negligence where a consumer is injured by a defective product. I believe that the purpose of the AEMLD is to protect the consumer from risks that have been created by a defective product. Therefore, I disagree with the majority's holding that allows Thaxton to assert the defense of contributory negligence in this case.

Product misuse as an AEMLD affirmative defense
I also disagree with the majority's interpretation of the product misuse defense. We have held that a misuse of a product occurs when a plaintiff utilizes the product "in some manner different from that intended by the manufacturer"; the misuse "must not have been `reasonably foreseeable by the seller or manufacturer.'" Kelly v. M. Trigg Enterprises, Inc., 605 So.2d 1185 (Ala.1992). For other definitions of product misuse corresponding to this Court's holding in M. Trigg Enterprises, see the Restatement (Second) of Torts § 402A Cmt. h ("A product is not [defective] when it is safe for normal handling and consumption. If [injury] results from abnormal handling.... abnormal preparation.... [or] abnormal consumption, the seller is not liable"); W. Prosser and W. Keeton, The Law of Torts § 102 (5th ed. 1984) (misuse is a utilization different from what was intended, and it is unforeseeable misuse in that the utilization could not have been reasonably anticipated by the manufacturer); L. Frumer and M. Friedman, Products Liability § 15.01 (1984) (misuse is the abnormal or unintended use of the product if that use was not reasonably foreseeable).
Product misuse, by definition, concerns an action taken by a person in utilizing the product in question which was both unintended and unforeseeable by the manufacturer. A court should look to both of these issues in determining whether the plaintiff's utilization of the product falls under the product misuse defense. A manufacturer may not intend for a product to be utilized in a certain manner; however, if that utilization was foreseeable, the product misuse defense does not bar recovery. Of course, if the product was intended for a certain purpose or purposes and is utilized for the intended purpose or purposes, that utilization is foreseeable, and does not bar recovery. Only if the utilization of the product was both unintended by the manufacturer and was not reasonably foreseeable by that manufacturer, will the product misuse defense bar the plaintiff's recovery in an AEMLD action. This two-pronged definition of the product misuse defense corresponds with the Court's holding in both M. Trigg Enterprises and Atkins, wherein the Court held that the gravamen of an AEMLD action is that the plaintiff was injured by a defective product while putting the product "to its intended use." Atkins, 335 So.2d at 139.
In my opinion, the questions as to Mr. Hicks's alleged misuse of the Thaxton plug must encompass both the manufacturer's intention for the use of the product and the manufacturer's ability to foresee that use. The majority, however, correctly defines product misuse but limits its application of that defense to that use that was not "reasonably foreseeable" by the manufacturer. 652 So.2d at 219. I believe, following M. Trigg Enterprises, that the manufacturer's intention must first be determined. If it can be shown that Thaxton intended for the plug to used in the manner in which it was used in this case, then the question of foreseeability would need not arise; there would be no product misuse defense available. Clearly, *224 as stated above, if a manufacturer intends for its product be used in a certain manner, then it would also be foreseeable to that manufacturer that such use would occur.

Assumption of the risk as an AEMLD affirmative defense
Finally, I disagree with the majority's view of assumption of the risk under the AEMLD. This Court has held that, to establish assumption of the risk as an affirmative defense in an AEMLD action, the defendant must show that the plaintiff had knowledge of the danger at hand, and made a voluntary and deliberate choice to assume that known danger. Dennis, supra. The majority, although citing Atkins in its discussion of the assumption of the risk defense, appears to follow the assumption of the risk definition of Dennis.
Under the assumption of the risk defense as defined in Dennis, there is no distinction between assumption of the risk in products liability cases and assumption of the risk in ordinary negligence cases. However, as the majority notes, the Atkins Court adopted the following language from Restatement (Second) of Torts § 402A in defining assumption of the risk under the AEMLD:
"If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."
Atkins, 335 So.2d at 143 (emphasis added).
The language of Atkins defining the assumption of the risk defense under the AEMLD differs from the Dennis definition of the assumption of the risk defense. A plain reading of the Atkins Court's definition indicates that an element of reasonableness should exist in the AEMLD defense of assumption of the risk. Therefore, following the language in Atkins, I believe that, for Thaxton to establish assumption of the risk in this AEMLD case, it should be required to show the following: first, that Mr. Hicks actually had knowledge of and appreciated the particular risk or danger; second, that Mr. Hicks voluntarily encountered the risk while realizing the danger; and third, that Mr. Hicks's decision to voluntarily encounter the known risk was unreasonable. An AEMLD defendant, when faced by a prima facie showing that it sent a defective product into the stream of commerce and was thus negligent as a matter of law should not be allowed to escape liability because the plaintiff exposed himself to a danger negligently created by the defendant, if that choice was reasonable under the circumstances.
Under the AEMLD assumption of the risk defense, I believe that several factors should enter the inquiry as to whether the decision to voluntarily encounter the danger was reasonable. These factors include the conditions under which the plaintiff made the decision and the amount of time that he had to make the decision. The circumstances surrounding the plaintiff's interaction with the product must be taken into account. For example, as in the instant case, a worker whose job requires exposure to danger and who, while working, is injured by a dangerous, defective tool of his trade can rarely be said to have assumed the risk of danger as a matter of law. I believe that the "voluntariness" with which a worker who is assigned to a dangerous machine encounters that danger is often illusory.
The majority does not apply the reasonableness element stated in Atkins to the facts of this case. In my opinion, the jury should not only make an inquiry into whether Mr. Hicks's encounter of the danger created by the Thaxton plug was knowledgeable and voluntary. Instead, the jury should be able to consider whether Mr. Hicks's actions were reasonable under the circumstances of his inherently dangerous work. Too often, the worker's "choices" in encountering danger on the job are made for him by the circumstances of his work. The Court should follow its own language of Atkins to direct the jury to consider the reasonableness of the plaintiff's action under the surrounding circumstances.
As I stated above, I agree with the majority that the jury, not the trial judge, should determine whether Thaxton should be held liable for Mr. Hicks's death. However, as it stands today, products liability law in Alabama simply does not meet the needs of the *225 consumers of Alabama, who deserve a better opportunity to receive compensation for their injuries that stem from defective products.
HORNSBY, Chief Justice (concurring in part and dissenting in part):
I concur with the Court's opinion in all respects except its application of the doctrine of contributory negligence to the AEMLD claim. See my dissent in General Motors Corp. v. Saint, 646 So.2d 564 (Ala.1994).
COOK J., concurs.
NOTES
[1] These defendants were Michael W. Onderdonk, Lloyd Lee Hull, and Asa Joseph Schram. The circuit court later entered a summary judgment in their favor. Vernda Hicks does not appeal from that judgment.
[2] There would be little difference between § 402A strict liability and the Atkins Court's theory of negligence as a matter of law, if contributory negligence was struck from the list of AEMLD available defenses.

"In essence, strict liability ... is not different from negligence per se. Selling a dangerously unsafe product is the equivalent of negligence regardless of the defendant's conduct in letting it become unsafe.... Thus, a court which appears to be taking the radical step of changing from negligence to strict liability for products is really doing nothing more than adopting a rule that selling a dangerously unsafe chattel is negligence within itself."
J. Wade, Strict Tort Liability of Manufacturers, 19 Sw.L.J. 5, 14 (1965).