This appeal involves a claim under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). Virgil Wallace Fenley was injured at his worksite when a machine press he was operating crushed his left hand. Rouselle Corporation had manufactured the press and Pearl Equipment Company had sold it to Fenley's employer. Fenley and his wife sued these two companies and others.[1] The trial court entered summary judgment for Rouselle and Pearl Equipment, making the judgment final pursuant to Rule 54 (b), A.R.Civ.P. The court held that Fenley was guilty of contributory negligence as a matter of law and, further, that these defendants could not be held liable because the press had been substantially altered after it left their control.
The following excerpts from the judgment below provide the factual background and the basis of the court's decision:
"FACTUAL BACKGROUND
 "The press was acquired by the employer of the Plaintiff and as manufactured was operated by a foot treadle. Prior to the day of this accident, the foot treadle had been removed. The employer was in the process of altering the press at the time of the accident by converting it to operate off of four palm buttons. Once the alterations were completed, the operation of the press would require two employees, each with both hands fully engaged on the buttons, before the press would operate.
 "Before the modification process had been completed, the employer elected to run some parts and had installed one unguarded palm button at approximately waist high in order to do so. The plaintiff, Virgil Wallace Fenley, apparently leaned against the one unguarded palm button, thus activating the press and injuring his hands.
 "In short, the Plaintiff and his employer were making temporary use of the press by putting the press in operation before the modification procedure had been completed. *Page 305 
 "The Plaintiff had been working as a press operator or die setter for approximately ten years before this accident occurred. He was thoroughly familiar with the press and that the purpose of the press was to press, mash, or cut items. He also knew that company rules and regulations required him to turn the master switch off before attempting to change a die. He also was aware of the operating condition and circumstances surrounding the machine at the time he was injured.
"FINDINGS
 "In view of the foregoing, the Court finds that the plaintiff, Virgil Wallace Fenley, was guilty of contributory negligence as a matter of law. Wallace v. Doege, 484 So.2d 404 [ (Ala. 1986) ]. The Court further finds that the press in question had been substantially altered subsequent to the time of manufacture and that would relieve the manufacturer of any liability under the Alabama Extended Manufacturer's Liability Doctrine. Casrell v. Altec Industries, Inc., 335 So.2d 128 [(Ala. 1976)], and Williams v. Michelin Tire Corporation, 496 So.2d 743 [ (Ala. 1986) ]. At the time the Plaintiff was injured, the machine was being operated in a manner or fashion and in a rigged condition that could not have been foreseen by the manufacturer."
In opposition to the motion for summary judgment, Fenley submitted the affidavit of a proposed expert witness, George W. Greenwood, in which he expressed his opinion
 "as an expert in power press machinery that Rouselle Corporation was negligent in the manufacture of the press that injured Virgil Wallace Fenley. More specifically, Rouselle Corporation was negligent in its design of the machine that injured Virgil Wallace Fenley in that it did not have affixed to it a warning plate; it was not equipped with an interlock movable barrier guard; it was not equipped with electrically actuated die blocks; and the operating instructions provided with the machine were not adequate."
Rouselle responded with the following affidavit by its vice president Adam Schwarz:
 "[W]hen the press was delivered to the customer, it had no point of operation. It was not sold with a die. Literally tens of thousands of different size and shape dies can be added to make millions of different sizes and shape products. Point of operation guarding has to be provided by the user, according to what he is using the press for.
 ". . . There is no such thing as an interlock moveable barrier guard which had been developed by 1968 [the date of the machine's delivery], which could have been placed on the press by the manufacturer which would have been suitable for any use. That fact has been recognized by the authors of the OSHA standards and the ANSI standards, because they place the responsibility of guarding the point of operation on the user of the press.
 "It was industry practice for the user to put something of sufficient strength in the die space area to prevent the ram from descending when the dies were being changed or maintained. It is not necessary that an electrically actuated die block be used for that purpose. Most users choose to make their own die blocks to use for that purpose. OSHA requirements clearly place the responsibility for the selection and use of die blocks upon the press user. I am not aware of any manufacturer who was selling this size press in 1968 who offered a light weight, electrically actuated die block for sale with the press. Electrically actuated die blocks were later offered as an option to the purchaser of presses, but they are seldom used on a press this small.
 "Operating instructions would have been provided with the machine, but since this press had been totally modified before the accident, the operating instructions provided with the machine would no longer have been suitable or applicable to the press as modified. Our records indicate that Rouselle was not involved in the modification or consulted before the modification." *Page 306 
Fenley argues that Greenwood's affidavit presents a material question of fact as to whether Rouselle was negligent in failing to provide the proper guards, blocks, and warnings on the press. Even assuming such a question to exist in spite of Schwarz's affidavit that such items are the responsibility of the user, not the manufacturer, we find that the trial court did not err in holding, as a matter of law, that there was no liability on the part of these defendants because the substantial modifications to the press constituted a superseding cause of the accident.
The rigging of the press to operate with one palm button was not the only change that decreased the safety of the press. James Brooks, the electrician who modified the press for Fenley's employer, testified regarding the changes made. He had been installing new electrical equipment and controls supplied by Rockford Safety Equipment. The press in question was the last to have its controls changed, and Fenley's employer instructed him to get this press running the best way he could, so that it could be used temporarily. He did not install the controls specified by Rockford Safety Equipment.
For one operator, the press should have had two palm buttons wired in series so that the machine could operate only when the operator had both hands on the buttons. The buttons required guards so that they could not be pressed accidentally, but the guard was not in place on the button that caused the accident. The control box had interlocks to require the use of both buttons, but Brooks had bypassed the interlocks. He also testified that an anti-tie-down circuit was not wired, but did not specify how that made the machine less safe. The motor start circuit was also bypassed. Brooks was asked, "When the motor had been turned to the off position, and if the motor start circuit had been wired properly, could the press have been actuated?" He answered, "No." There is evidence in the record that Fenley may have turned the motor off before attempting to change dies, but did not wait for the motor to stop completely, and that the press could operate as long as the motor was still turning.
Thus, it can be seen that Fenley's employer had caused numerous safety devices on the machine to be deactivated and had made the machine operate in a very different manner than it had when it left the control of Rouselle and Pearl Equipment.
Both Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala. 1976), and its companion case, Atkins v. American Motors Corp.,335 So.2d 134 (Ala. 1976), in recognizing the AEMLD, mentioned or implied that substantial alteration could be a defense to a claim of manufacturer's liability. See Casrell at 132-33;Atkins at 139. Williams v. Michelin Tire Co., 496 So.2d 743
(Ala. 1986), held that a tire manufacturer could not be held responsible for the blowout of one of its tires that had been recapped, relying on the principle of substantial alteration. See also Sears, Roebuck Co. v. Haven Hills Farm, Inc.,395 So.2d 991 (Ala. 1981).
Defendants, in their excellent brief, cite the following cases from other jurisdictions applying the concept of substantial alteration (the first four involve machine presses): Temple v. Wean United, Inc., 50 Ohio St.2d 317,364 N.E.2d 267 (1977); Hardy v. Hull Corp., 446 F.2d 34 (9th Cir. 1971); Hanlon v. Cyril Bath Co., 541 F.2d 343 (3d Cir. 1975);Verson Allsteel Press Co. v. Garner, 261 Ark. 133,547 S.W.2d 411 (1977); Talley v. City Tank Corp., 158 Ga. App. 130,279 S.E.2d 264 (1981); Southwire Co. v. Beloit Eastern Corp.,370 F. Supp. 842 (E.D.Pa. 1974).
The trial court correctly applied the law to the undisputed facts in this case to hold that the plaintiffs could not recover against these defendants because of the substantial alterations of the press. We pretermit consideration of the contributory negligence issue.
AFFIRMED.
TORBERT, C.J., and MADDOX, BEATTY and HOUSTON, JJ., concur.
[1] The wife made a derivative claim for loss of consortium; because her claim is derivative only, we shall refer solely to Mr. Fenley as plaintiff. *Page 307