Betty Chunn appeals from a summary judgment entered in favor of Kathryn Whisenant, Don Morrow, Ernestine Morrow, and River Valley Properties, Inc., in Chunn's action seeking, among other things, an equitable lien on improvements she made to real estate as Whisenant's *Page 597 
lessee. We affirm in part, reverse in part, and remand.
The facts material to this appeal are undisputed. In 1991, Whisenant owned a building in Huntsville, in which an adult lounge had operated for several years. By an instrument dated August 1, 1991, Whisenant agreed to lease the property to Chunn for six months. Chunn began operating an "adult cabaret" on the premises, known as "Chick's Lounge." By its terms, the lease expired on January 31, 1992; it was never renewed in writing. However, Chunn continued to operate the lounge under an oral arrangement ("the arrangement") until 1997.
On April 13, 1997, the property was damaged by a fire. Because the property was uninsured and unusable in its damaged state, Chunn and Whisenant discussed the future of the arrangement. When Whisenant indicated that she did not intend to repair the building, they discussed whether Chunn could pay for the repairs. Whisenant described the conversation as follows:
"[Chunn] said: `Can I repair it; would you let me stay there?'
 "And I said: `Yes, as long as I own the building, you can stay there as a lounge as long as you keep a clean operation until I decide to do something else with the building or sell it.'"
During that same conversation, Whisenant also said that if she ever sold the property, she would give Chunn the "first opportunity to buy it."
Subsequently, Chunn paid $42,514 for repairs to the building. In June 1997, the lounge reopened and continued in operation for the next four years.
By an instrument dated August 24, 2001, Whisenant agreed to sell the property to Ernestine Morrow and her husband, Don Morrow, for $119,270. It is undisputed that Whisenant never offered to sell the property to Chunn for that price. According to the unrefuted testimony, at or about the time of the offer to the Morrows, Whisenant offered to sell the property to Chunn for $179,000. Chunn declined the offer and did not discover the substance of the offer to the Morrows until after the sale.
Subsequently, in October 2001, discussions occurred between the Morrows and Chunn regarding the future of Chick's Lounge. At that time, according to Don Morrow's deposition, he proposed to Chunn that she sell him "her equipment," including poker machines, a cooler, tables and chairs, and liquor. He presented Chunn with an instrument, styled "Agreement for Purchase and Sale of Assets" ("the Agreement"), pursuant to which he agreed to buy the equipment for $19,000. Morrow told her that if she did not sign the Agreement, she would have to remove her equipment from the premises.
During the discussion, Chunn asked Morrow about the $42,514 she had invested in the premises. Morrow told her that he "didn't know anything about that, [and that] she would have to take that up with [Whisenant]."
Chunn did ask Whisenant to reimburse her for the improvements, and Whisenant refused to pay her anything, stating: "I didn't tell you to put it in there, you done it on your own." Chunn and Don Morrow signed the Agreement on October 15, 2001.
On February 7, 2002, Chunn sued Whisenant and Don Morrow. The complaint, as last amended, named as defendants Whisenant; Don Morrow and Ernestine Morrow; and River Valley Properties, Inc., which, it was alleged, was owned by the Morrows and had some interest in the property. The complaint contained claims against Whisenant alleging (1) fraud, (2) misrepresentation, (3) breach of contract, *Page 598 
(4) a quasi-contract theory of recovery, (5) "interference with contractual or business relations," and (6) promissory estoppel. It contained claims against Ernestine Morrow alleging breach of contract, and against Don Morrow and Ernestine Morrow alleging (1) breach of fiduciary duty and (2) "interference with contractual or business relations."[1] It sought various species of equitable relief, including (1) an "equitable lien against the premises," (2) damages in quantum meruit, and (3) annulment of the sale of the premises to the Morrows.
On August 29, 2002, Chunn moved for a summary judgment on her breach-of-contract and promissory-estoppel claims against Whisenant. On November 18, 2002, Don Morrow and Ernestine Morrow moved for a summary judgment as to Chunn's claims against them and River Valley Properties. On February 25, 2003, Whisenant moved for a summary judgment. Whisenant's motion challenged specifically only the breach-of-contract claim, asserting that the claim was barred by the Statute of Frauds, Ala. Code 1975, § 8-9-2. As for the remainder of Chunn's claims, Whisenant's motion stated:
 "Chunn sold to Donald and Ernestine Morrow all of her rights in the subject property, including any rights she might have had as a tenant, prior to filing . . . this action. As a result, all of Chunn's claims, if any at all ever existed, were assigned to the Morrows, and Chunn is barred from asserting those claims."
(Emphasis added.) On February 28, 2003, the trial court — citingonly the Agreement — granted the motions of the Morrows and Whisenant and denied the motion of Chunn.
Chunn appealed, contending that the Agreement did not release or extinguish any claims she has against Whisenant.[2] She insists that Morrow and she never intended for the Agreement to encompass her claims for the recovery of funds she expended on improvements to the leased premises following the fire in April 1997. Moreover, she argues, Whisenant never paid any consideration for the Agreement, and, therefore, Whisenant is "not entitled to . . . benefit from any purported release language contained in the Agreement." Brief of Chunn, at 46.
The Agreement provides:
"AGREEMENT FOR PURCHASE AND SALE OF ASSETS
 "THIS AGREEMENT is made at Huntsville, Alabama, this 15 day of October 2001 by BETTY CHUNN (hereinafter referred to as `Seller'), . . . and DONALD W. MORROW (hereinafter referred to as `Purchaser'). . . .
"RECITAL
 "The Purchaser desires to purchase and receive from the Seller, and the Seller desires to sell and assign to the Purchaser, Seller's below-named properties, assets and business as a going concern.
"AGREEMENT
 "THEREFORE, in consideration of the mutual promises and conditions contained in this Agreement, the parties hereby agree as follows: *Page 599 
"PURCHASE AND SALE
 "1. Upon the terms and conditions in this Agreement and the performance by each party of their respective obligations, the Purchaser agrees to purchase from the Seller, and the Seller agrees to sell and deliver to the Purchaser on the closing date, all the herein-described Seller's properties, assets and business as a going concern other than her accounts receivable, corporate books, records, and seal, all of which shall be retained by the Seller.
"PURCHASE PRICE
 "2. Subject to the terms and conditions of this Agreement, and in full consideration for the conveyance, transfer and delivery of the Seller's herein-described properties, assets and business to the Purchaser at the closing:
 "(a) The purchase price is NINETEEN THOUSAND AND NO/100 DOLLARS ($19,000.00).
 "(b) The Purchaser will deliver the sum of FIFTEEN THOUSAND AND NO/100 DOLLARS ($15,000.00) in certified funds upon execution of this Agreement. The Seller expressly agrees that she has already received the sum of ONE THOUSAND EIGHT HUNDRED AND NO/100 DOLLARS ($1,800.00) through October 15, 2001, as pre-payment herein.
 "(c) Seller agrees to pay to Purchaser the balance of TWO THOUSAND TWO HUNDRED AND NO/100 DOLLARS ($2,200.00) in certified funds in regular weekly payments of TWO HUNDRED AND NO/100 DOLLARS ($200.00). Payments shall continue until paid in full, with the final payment due no later than the 31st day of December 2001. Purchaser has the right to pre-pay the balance prior to December 31, 2001, without penalty.
"INVENTORY
 "3. The foregoing purchase price shall be given in consideration of the sale, transfer and conveyance of the following:
 "(a) the business currently operated as `Classic Country' (a/k/a Chick's Lounge), located at 12531 Memorial Parkway South, Huntsville, Alabama 35803; and
 "(b) the goodwill, office supplies, inventory, and attachments of said business.
 "4. It is expressly understood and agreed by the parties hereto that the above does not include those machines provided by Clayton Amusement Company.
"DEBTS
 "5. The Seller agrees to be and is hereby solely responsible for all previous debts of `Classic Country' and will hold Purchaser harmless from same. The said debts includes but is not limited to past accounts payable, rent, utilities, payroll, and state, federal, and local taxes.
"LICENSURE
 "6. The Seller agrees to allow the Purchaser to operate under its Business and Alcohol license through the 31st day of December 2001.
"ASSIGNMENT OF LEASE
 "7. The Seller hereby assigns to Purchaser her rights in the lease she previously entered into with the owner of the premises located at 12531 Memorial Parkway South. *Page 600 
"WARRANTY
 "8. The Seller hereby warrants that the leasehold being transferred, 12531 Memorial Parkway South, is free and clear of all claims including but not limited to those specified in Paragraph 5, herein.
"FINAL AGREEMENT
 "9. This Agreement constitutes the entire agreement between the parties hereto, and there are no agreements, understandings, restrictions, warranties of representations between the parties other than those set forth herein or herein provided for.
 "IN WITNESS WHEREOF, the undersigned Seller and Purchaser each set their hand and seal on this 15 day of October 2001, at Huntsville, Alabama."
Citing paragraphs 1 and 7 of the Agreement, the appellees argue that "Chunn clearly and unequivocally sold or assigned all of the rights she might have had in the property or the purported lease to Morrow." Brief of appellees, at 17-18 (emphasis added). "That assignment," they insist, "included her right to bring the instant action against the appellees."Id. at 18 (emphasis added). "As a result," they argue, "the trial court's entry of summary judgment was correct and is due to be affirmed." Id. For the following reasons, we disagree with these contentions.
First, the appellees exaggerate the scope of paragraph 1. They read it as though it said: "[Chunn] agrees to sell and deliver to [Morrow] on the closing date, all [of Chunn's] properties, assets and business as a going concern." Actually, the paragraph states:
 "Upon the terms and conditions in this Agreement and the performance by each party of their respective obligations, [Morrow] agrees to purchase from [Chunn], and [Chunn] agrees to sell and deliver to [Morrow] on the closing date, all the herein-described [Chunn's] properties, assets and business as a going concern other than her accounts receivable, corporate books, records, and seal, all of which shall be retained by [Chunn]."
(Emphasis added.) In other words, the appellees ignore the clear language of paragraph 1, which limits the scope of the sale to those assets "herein described," that is, to those assets actually described in thedocument.
Those assets are listed in paragraph 3(a) and (b), under the heading, "Inventory." They consist of "the business" and the "goodwill, office supplies, inventory, and attachments of said business." Conspicuously absent from this list — and from every other paragraph in the instrument — is reference to any legal or equitable interest inreal estate.
According to the familiar principle of noscitur a sociis, "where general and specific words which are capable of an analogous meaning are associated one with the other, they take color from each other, so that the general words are restricted to a sense analogous to that of the less general." Winner v. Marion County Comm'n, 415 So.2d 1061, 1064 (Ala. 1982). Nothing in the Agreement evidences an intent to include within the terms "assets" or "business" the transfer or assignment of an interest, or a right to assert an interest, in real estate.
This is especially significant in light of the fact that the real estate was then owned by the Morrows. The appellees argue: "Summary judgment was properly entered in favor of the appellees as to all of Chunn's claims because, prior to her initiation of this action, Chunn sold the subject business along with all of her *Page 601 
rights therein, including any rights she might have had as a tenant, to Morrow." Brief of appellees, at 16. The appellees' argument invites the conclusion that Morrow purchased the right to assert an equitable lien against propertyowned by him.
We cannot reach this conclusion. The purchase of such a right would have been in essence a "release." However, the Agreement does not purport to be a "release." The word, "release," like the phrase "real estate," appears nowhere in the Agreement.[3]
Equally unavailing is the appellees' reliance on paragraph 7, which states: "[Chunn] hereby assigns to [Morrow] her rights in the lease she previously entered into with [Whisenant]." (Emphasis added.) The "lease" expired on January 31, 1992. From then until Whisenant sold the property, Chunn operated Chick's Lounge by the amorphous oral permission of Whisenant. Presumably, it was this arrangement to which paragraph 7 referred.
In any case, Whisenant's promise to give Chunn the "first opportunity to buy" the property was not a "lease" in any sense, but a "right of first refusal" in the form of a side agreement. It was supported by consideration independent of the lease, namely, Chunn's promise to repair the real estate. Thus, paragraph 7, by its express reference to thelease, did not purport to assign or transfer any interest arising from the right-of-first-refusal side agreement. In short, the Agreement has no effect on claims arising out of the alleged breach of the right of first refusal, and the trial court erred in relying on the Agreement as a basis for its summary judgment.
It is undisputed that the Agreement was the sole basis for the summary judgment. The effect of the Agreement on Chunn's claims is the soleissue addressed in the appellees' brief. Indeed, the purported assignment is the only argument ever directed to all of Chunn's claims. More specifically, Whisenant's summary-judgment motion did not otherwisechallenge Chunn's claims of fraud, misrepresentation, quasi-contract, interference with contractual or business relations, or promissory estoppel. Because the trial court considered those claims only in the context of the Agreement, and erred in so doing, we reverse the summary judgment in favor of Whisenant, and remand the case for further proceedings.
We hasten to point out, however, that Chunn makes no argument and cites no authority in support of any of her claims against the Morrows or River Valley Properties. Thus, we deem as abandoned any challenge to the summary judgment in favor of the Morrows and River Valley Properties.Tucker v. Cullman-Jefferson Counties Gas Dist., [Ms. 1011530, May 9, 2003] 864 So.2d 317 (Ala. 2003); Bettis v. Thornton, 662 So.2d 256, 257
(Ala. 1995) (an argument not made on appeal is abandoned or waived);Pardue v. Potter, 632 So.2d 470, 473 (Ala. 1994) ("Issues not argued in the appellant's brief are waived."). The summary judgment in favor of Don Morrow, Ernestine Morrow, and River Valley Properties is, therefore, affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOUSTON, LYONS, JOHNSTONE, and STUART, JJ., concur.
[1] The complaint, as last amended, asserted no claims specifically against River Valley Properties.
[2] On appeal, Chunn makes no argument and cites no authority in support of her claims against the Morrows and River Valley Properties; thus, she has abandoned any challenge to the summary judgment in their favor.
[3] Indeed, the word "release" never appears in the brief the appellees filed in this Court. Otherwise stated, the appellees do not argue that the Agreement constitutes a "release." *Page 602