972 So.2d 63 (2007)
Angela Mitchell HORN, as personal representative of the estate of Pamela Ann Mitchell
v.
FADAL MACHINING CENTERS, LLC, and Cardinal Machinery, Inc.
1051161.
Supreme Court of Alabama.
February 9, 2007.
Rehearing Denied May 11, 2007.
*67 David A. Kimberley of Cusimano, Keener, Roberts, Kimberley & Miles, P.C., Gadsden, for appellant.
Lawrence B. Clark and Jason Asbell of Baker, Donelson, Bearman, Caldwell & Berkowitz, Birmingham, for appellee Fadal Machining Centers, LLC.
Daniel S. Wolter and Brandon T. Bishop of Gaines, Wolter & Kinney, P.C., Birmingham, for appellee Cardinal Machinery, Inc.
WOODALL, Justice.
Angela Mitchell Horn, as personal representative of the estate of Pamela Ann Mitchell, appeals from a summary judgment in favor of Fadal Machining Centers, LLC ("Fadal"), and Cardinal Machinery, Inc. ("Cardinal"), in Horn's product-liability action against Fadal, Cardinal, and others for the wrongful death of Pamela Mitchell. We affirm in part, reverse in part, and remand.

I. Factual Background
Mitchell died on February 1, 2002, while operating a model VMC-6030HT vertical milling machine, one of three such machines purchased by her employer, Southern Defense Systems, Inc. ("SDS"), for use in its business. The machine cuts materials of various compositions, including metal and plastic. Its cutting tools are attached to a spindle that rotates at variable speeds from as low as 150 rpm to as high as 10,000 rpm. The machine can be operated in "manual mode" or in "automatic mode."
The machine was designed and manufactured by Fadal. SDS purchased it through Cardinal, a "sales/service" company, which also installed the machine on the premises of SDS on June 24, 1997, and made four visits to SDS between June 24, 1997, and February 1, 2002, to service or perform maintenance on the machine. At the time of its purchase and installation, the machine was equipped with impact-resistant "front door shields" ("the doors") that enclosed the cutting area. It also had an electronic feature described as a "safety interlock system" ("the interlock"), which automatically prevented the spindle from rotating when the doors were open and the machine was being operated in automatic mode. There was evidence indicating that the interlock was working properly on June 24, 1997, when the machine was installed.
At the time of the accident, two relevant warning stickers were affixed to the machine. One sticker read, in pertinent part: "Flying objects from this machine may injure. ALWAYS wear safety glasses when operating this machine. . . . DO NOT operate this machine with the doors open or with enclosures removed." Another sticker read: "Cutting tools can seriously injure or kill. DO NOT operate unless doors are closed and interlocks are working." (Capitalization in original.) That sticker also included a drawing of a hand above a rotating blade showing the tips of fingers being severed. Finally, the "Fadal Engineering User's Manual" ("the user's manual") stated, in pertinent part: "Rotating cutting tools can severely injure. NEVER place any part of the body near rotating cutting tools. Inspect cutting *68 tools for damage before operating this machine. DO NOT operate this machine unless doors are closed. DO NOT operate this machine unless door interlocks are working properly." (Capitalization in original.)
The accident occurred while the doors to the cutting area were open and the spindle was rotating at 4,000 rpm. Attached to the spindle was a cutting tool fabricated by SDS. Mitchell was killed when the cutting tool broke and flew out of the cutting area, striking her in the throat. Three days later, the Occupational Safety and Health Administration ("OSHA") began an investigation of the accident and inspection of the premises. The report generated by the inspection reveals that the interlocks on all three machines had been disabled and were nonfunctional on the day of the accident. This result had been accomplished by an unknown individual or individuals, who, at unknown times, had unplugged the "J-13 circuit" in the circuit panels located on the back of each machine. Shortly after the OSHA inspection, "Buck" Kadrowski, a service representative for Fadal, performed an on-site investigation and discovered that the J-13 circuits had been reconnected and that the interlocks were operational.
In February 2003, Horn filed this wrongful-death action against Fadal, Cardinal, and others. Her claims against Fadal and Cardinal included violations of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), negligence, and breach of the implied warranty of merchantability under Ala.Code 1975, § 7-2-314. Fadal and Cardinal each moved for a summary judgment. The trial court granted their motions and certified the judgment as a final judgment pursuant to Ala. R. Civ. P. 54(b). Horn appealed.

II. Discussion
On appeal, Horn challenges the summary judgment on the AEMLD claims as to both Fadal and Cardinal. However, she challenges the judgment on the negligence claims as to only Cardinal, and she challenges the judgment on the breach-of-warranty claims as to only Fadal.[1] We first address the propriety of the summary judgment in favor of Fadal.

A. Judgment for Fadal
On December 16, 2005, Fadal filed a motion for a summary judgment that stated, in toto:
"Comes now Defendant, Fadal Machining Centers, LLC, and pursuant to [Ala. R. Civ. P.] Rule 56, moves the court for summary judgment and in support thereof, says as follows:
"1. This case involves the removal of a safety device, an interlock intended to require the polycarbonate doors be closed before defendant's machine could be operated in the automatic mode. The evidence is undisputed that the interlock had been defeated and that [Mitchell] was using the machine in spite of adequate warnings not to operate the machine without operable interlocks. Thus, under the undisputed facts of this case, this defendant's machine had been substantially altered by willful acts of someone intending to defeat defendant's safety device.
"2. The tool used at the time of the accident was not manufactured or sold *69 by this defendant and was defective. The defects in the tool caused it to wobble while [Mitchell] was using it. In addition, the tool holding components were worn out and incapable of holding the tool in place. [Mitchell] was well aware of the condition of the tool holding components and used a hammer on a wrench in an effort to tighten the tool holding components. As a consequence of the combination of these two factors, the tool became disengaged causing [Mitchell's] death.
"3. The design of the machine approved by plaintiff's expert is one which the defendant manufactures for sale in Europe. Plaintiff's evidence is that any interlock is capable of defeat, and, as demonstrated by the Affidavit of Kathleen Holst, not only can the European interlock system be defeated, she has observed such defeat.
"4. The proper operating speed for defendant's machine under the circumstances at the time of the accident was more or less 150 rpms, yet [Mitchell] was operating the machine at 4,000 rpms, clearly an improper use of defendant's machine under those circumstances.
"This defendant attaches the identification of expert witnesses as well as Affidavits signed by them in support of this motion.
"WHEREFORE, PREMISES CONSIDERED, defendant moves the court for summary judgment."
Fadal filed no brief/memorandum of law in support of this motion.
The role of this Court in reviewing a summary judgment is well establishedwe review a summary judgment de novo, "`apply[ing] the same standard of review as the trial court applied.'" Stokes v. Ferguson, 952 So.2d 355, 357 (Ala.2006) (quoting Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038 (Ala.2004)). "In order to grant the [summary-judgment] motion, the court must find clearly [1] that there is no genuine issue of material fact and [2] that the movant is entitled to a judgment as a matter of law. . . . The movant bears the burden initially of showing the two prongs of the standard." Maharry v. City of Gadsden, 587 So.2d 966, 968 (Ala.1991) (second emphasis added). "If the movant meets [its] burden of production by making a prima facie showing that he is entitled to a summary judgment, `then the burden shifts to the nonmovant to rebut the prima facie showing of the movant.'" American Gen. Life & Accident Ins. Co. v. Underwood, 886 So.2d 807, 811-12 (Ala.2004) (quoting Lucas v. Alfa Mut. Ins. Co., 622 So.2d 907, 909 (Ala. 1993)).
However, "the party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden, then he is not entitled to judgment. No defense to an insufficient showing is required." Ray v. Midfield Park, Inc., 293 Ala. 609, 612, 308 So.2d 686, 688 (1975) (emphasis added). See also Watts v. Watts, 943 So.2d 115 (Ala.2006); Legg v. Kelly, 412 So.2d 1202 (Ala.1982). Thus, this Court must initially consider the sufficiency of Fadal's showing in order to determine whether the burden of rebuttal ever shifted to Horn.
"Rule 56(c)(1), Ala. R. Civ. P., requires that a motion for summary judgment `be supported by a narrative summary of what the movant contends to be the undisputed material facts.' Although it may be included in the motion or may be separately attached as an exhibit, the rule clearly requires that a narrative summary be included with any motion for summary judgment. The narrative summary must include specific *70 references to pleadings, portions of discovery materials, or affidavits for the court to rely on in determining whether a genuine issue of material fact exists.
"A summary judgment is not proper if the movant has not complied with the requirements of Rule 56. Moore v. ClaimSouth, Inc., 628 So.2d 500 (Ala. 1993); see also Thompson v. Rehabworks of Florida, Inc., 727 So.2d 807 (Ala. Civ.App.1997), Hale v. Union Foundry Co., 673 So.2d 762 (Ala.Civ. App.1995). While the Rule provides that a movant may base its motion upon the pleadings and other documents on file with the court, it does not allow a party to file a simplistic motion devoid of a narrative summary and specific references to those portions of the record demonstrating that no genuine issue of material fact exists."
Northwest Florida Truss, Inc. v. Baldwin County Comm'n, 782 So.2d 274, 276-77 (Ala.2000) (summary judgment reversed for failure to file a narrative summary of undisputed facts) (emphasis added); see also Singleton v. Alabama Dep't of Corr., 819 So.2d 596, 600 (Ala.2001)("an entry of a summary judgment for the defendants would not be proper until they have complied with the requirement of [Rule 56, Ala. R. Civ. P.,] that they submit a narrative summary of what they contend to be the undisputed material facts").
Having filed no memorandum of law, Fadal filed no narrative summary of undisputed facts as required by Rule 56(c). The summary-judgment motion contains only conclusory allegations regarding (1) the adequacy of the warnings affixed to the machine, (2) the substantiality of the alteration to the machine, (3) Mitchell's awareness of the condition of the cutting tool, (4) her alleged method of tightening the tool, and (5) the proper operating speed of the machine. Although the motion was accompanied by affidavits, it did not "include specific references to pleadings, portions of discovery materials, or affidavits for the court to rely on." Northwest Florida Truss, 782 So.2d at 277. It was nothing more than "a simplistic motion devoid of a narrative summary and specific references to those portions of the record [purporting to demonstrate] that no genuine issue of material fact exists." Id.
A motion that does not comply with Rule 56(c) does not require a response in defense from the nonmovant. Ray, 293 Ala. at 612, 308 So.2d at 688. Because the burden never shifted to Horn to rebut Fadal's motion, the summary judgment for Fadal was improper, regardless of the sufficiency of Horn's response, and that judgment is reversed with the exception of the abandoned failure-to-warn claim. We shall restrict our discussion in the remainder of the opinion to the issues presented by the judgment in favor of Cardinal.

B. Judgment for Cardinal

1. AEMLD
In order to defeat a properly supported summary-judgment motion, the plaintiff claiming a violation of the AEMLD must present substantial evidence indicating that he or she was injured or damaged by a product, which was sold "in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer" by one "engaged in the business of selling such a product," where the product was "expected to and [did] reach the [plaintiff] without substantial change in the condition in which it [was] sold." Casrell v. Altec Indus., Inc., 335 So.2d 128, 132-33 (Ala.1976). "The term `defective' means that the product fails to meet the reasonable safety expectations of an `ordinary consumer,' that is, an objective `ordinary consumer,' possessed of the ordinary knowledge common to the community." Deere & Co. v. Grose, 586 So.2d 196, 198 *71 (Ala.1991) (quoting Casrell, 335 So.2d at 133 n. 2). "[W]hether or not a product is defective is ordinarily a question for the jury." Joe Sartain Ford, Inc. v. American Indem. Co., 399 So.2d 281, 284 (Ala. 1981), overruled on other grounds, Lloyd Wood Coal Co. v. Clark Equip. Co., 543 So.2d 671 (1989); see also Gean v. Cling Surface Co., 971 F.2d 642 (11th Cir.1992); Entrekin v. Atlantic Richfield Co., 519 So.2d 447, 449 (Ala.1987).
a. Plaintiff's Theory
According to Horn, the feature that made it "easy" to disable the interlock by "simpl[y] unplugging the J-13 circuit render[ed] the [machine] defective and thus unreasonably dangerous." Horn's brief, at 49. Horn's expert witness, B.J. Stephens, testified that it was foreseeable that the interlock "[would] be defeated," and that it was too easy to defeat the interlock. Horn's theory of the case is that Mitchell was killed while operating the machine in automatic mode, and that the machine was operational in that mode with the doors open and the cutting area unprotected because the interlock could be disabled by simply unplugging one wire in the circuit box on the back of the machine. Her theory, in other words, is that the machine as designed and marketed virtually invited removal of the interlock so as to permit open-door operation in the automatic mode. Thus, Horn does not fault the design for failing to inhibit open-door operation of the machine in manual mode.
In that connection, Cardinal contends that Horn "has failed to present substantial evidence indicating that the machine was in fact being operated in automatic mode." Cardinal's brief, at 27 (emphasis added). We disagree. It is undisputed that Mitchell's machine was set to operate at 4,000 rpm at the time of the accident. Roy Procter,[2] who is the "machine shop supervisor" for SDS and was, therefore, Mitchell's supervisor at the time of the accident, testified that 4,000 rpm was a "more appropriate" speed for automatic mode.
That fact is also supported by findings contained in the OSHA report. According to the OSHA report, Mitchell's machine had "finished [its] X axis," and she "was preparing [to make] her second cut" when the cutting tool broke. (Emphasis added.) Based on these findings, Horn's expert witness, B.J. Stephens, opined that the machine must have been operating in automatic mode. Procter agreed with Stephens that the OSHA findings suggest that Mitchell was operating the machine in automatic mode. In particular, he stated that if Mitchell was in the process of making a "second cut" when the accident occurred, she must have been operating the machine in automatic mode. He also testified that one could infer from the finding that the machine had "finished the X axis" that Mitchell "was in the middle of a job and in the automatic mode." Thus, the evidence indicating that Mitchell was operating the machine in automatic mode at the time of the accident was substantial.
Cardinal also contends that because of the deliberate circumvention of the interlockostensibly by employees of SDS after the installation of the machine by Cardinal  the machine was not in substantially the same condition at the time of the accident as when it was marketed and sold. Therefore, it argues, the action of individuals not affiliated with Cardinal was an intervening cause of the accident, relieving Cardinal of liability.
Horn, however, contends that alteration does not relieve Cardinal of liability as a matter of law. This is so, because, she *72 argues, "where an alteration or modification is reasonably foreseeable to a manufacturer or seller, the manufacturer or seller is not relieved of liability under a design defect claim under the AEMLD." Horn's brief, at 55-56. This argument is in accord with Alabama law.
"`An essential element of an AEMLD claim is proof that the product reached the consumer without substantial change in the condition in which it was sold. . . . However, the mere fact that a product has been altered or modified does not necessarily relieve the manufacturer or seller of liability.'" Hicks v. Commercial Union Ins. Co., 652 So.2d 211, 218 (Ala. 1994) (quoting Sears, Roebuck & Co. v. Harris, 630 So.2d 1018, 1027 (Ala.1993)). "`A manufacturer or seller remains liable if . . . the alteration or modification was reasonably foreseeable to the manufacturer or seller. . . .'" Id. (emphasis added).
Harris involved, among other things, an AEMLD action against a manufacturer and a retailer arising out of the improper installation of a water heater, resulting in the severe carbon-monoxide poisoning of the occupants of a mobile home. The heater was improperly installed "without a pipe to vent carbon monoxide and other exhaust gases outside the mobile home." 630 So.2d at 1023. The heater was previously owned, and no "draft hood" accompanied the heater when it left the original purchaser's possession.
"At trial, [the installer for the occupants] testified that when he installed the water heater he did not know that gas water heaters required venting." 630 So.2d at 1023. After a jury returned a verdict against the manufacturer and seller, the manufacturer and seller moved for a judgment notwithstanding the verdict,[3] arguing, among other things, that the plaintiffs had failed to "carry their burden of establishing that the water heater had not been substantially altered between its [sale] and the time of the accident." 630 So.2d at 1027. Indeed, the "undisputed evidence was that when the water heater was installed in the mobile home its draft hood and vent pipe and the plastic pouch containing the instruction manual were missing." 630 So.2d at 1023. However, the trial court denied their motion, and they raised that issue on appeal. The plaintiffs argued that "[i]t was foreseeable . . . that the pouch containing the instruction manual, as well as the draft hood and vent pipe, would be removed from the water heater." 630 So.2d at 1027.
This Court agreed with the plaintiffs and held that "the trial court did not err in denying the motions for a [judgment notwithstanding the verdict] on the basis of a substantial alteration of the product." 630 So.2d at 1028. The Court stated:
"[W]e hold that the changes in the water heater either were not substantial alterations or, if they were substantial alterations, were foreseeable. First, the evidence shows that the vent pipe was not sold with the water heater. The instruction manual states that the customer must provide his own vent pipe. Therefore, the absence of a vent pipe cannot be a substantial alteration of the product. Second, substantial evidence shows that the instruction manual [and] the draft hood . . . were detachable and easily removed. When the water heater was originally sold, the instruction manual was contained in a plastic pouch affixed to the water heater by adhesive tape. The draft hood was attached by slipping tabs located on the legs of the draft hood into holes placed in the jacket *73 top covering the top of the water heater. . . . Thus, the removal of the manual [and] the draft hood . . . was a foreseeable alteration of the water heater."
630 So.2d at 1028 (emphasis added).
Horn's expert testified that it was foreseeable that the interlock "[would] be defeated" and that it was too easy to defeat it. Gary Wooster, a computer engineer employed by Fadal, testified that Fadal "know[s]" that users attempt to defeat the interlock. Wooster also stated that users of the machines Fadal markets and sells in Europe "expect to be able to defeat it." Because there is substantial evidence indicating that attempts to disable the interlock were foreseeable, there is substantial evidence indicating that the machine "reached the consumer without substantial change in the condition in which it was sold." 652 So.2d at 218.
In that respect, Fenley v. Rouselle Corp., 531 So.2d 304 (Ala.1988), cited by Cardinal, is distinguishable. That case involved post-sale modifications of a machine press manufactured by Rouselle Corporation and purchased by the employer of the plaintiff, Virgil Fenley. 531 So.2d at 304. The trial court found that, before the accident that injured Fenley, his employer had modified the machine in a number of important ways:
"`The press was acquired by the employer of the Plaintiff and as manufactured was operated by a foot treadle. Prior to the day of this accident, the foot treadle had been removed. The employer was in the process of altering the press at the time of the accident by converting it to operate off of four palm buttons. Once the alterations were completed, the operation of the press would require two employees, each with both hands fully engaged on the buttons, before the press would operate.
"`Before the modification process had been completed, the employer elected to run some parts and had installed one unguarded palm button at approximately waist high in order to do so. The plaintiff, Virgil Wallace Fenley, apparently leaned against the one unguarded palm button, thus activating the press and injuring his hands.
"`In short, the Plaintiff and his employer were making temporary use of the press by putting the press in operation before the modification procedure had been completed.'"
531 So.2d at 304-05.
To those findings, this Court added the following comments:
"The rigging of the press to operate with one palm button was not the only change that decreased the safety of the press. James Brooks, the electrician who modified the press for Fenley's employer, testified regarding the changes made. He had been installing new electrical equipment and controls supplied by Rockford Safety Equipment. The press in question was the last to have its controls changed, and Fenley's employer instructed him to get this press running the best way he could, so that it could be used temporarily. He did not install the controls specified by Rockford Safety Equipment.
"For one operator, the press should have had two palm buttons wired in series so that the machine could operate only when the operator had both hands on the buttons. The buttons required guards so that they could not be pressed accidentally, but the guard was not in place on the button that caused the accident. The control box had interlocks to require the use of both buttons, but Brooks had bypassed the interlocks. He also testified that an anti-tie-down circuit was not wired, but did not specify *74 how that made the machine less safe. The motor start circuit was also bypassed. Brooks was asked, `When the motor had been turned to the off position, and if the motor start circuit had been wired properly, could the press have been actuated?' He answered, `No.' There is evidence in the record that Fenley may have turned the motor off before attempting to change dies, but did not wait for the motor to stop completely, and that the press could operate as long as the motor was still turning.
"Thus, it can be seen that Fenley's employer had caused numerous safety devices on the machine to be deactivated and had made the machine operate in a very different manner than it had when it left the control of Rouselle. . . . "
531 So.2d at 306 (emphasis added). Significantly, the trial court held that, "[a]t the time [Fenley] was injured, the machine was being operated in a manner or fashion and in a rigged condition that could not have been foreseen by the manufacturer." 531 So.2d at 305. On the basis of those findings and that holding, this Court affirmed the summary judgment in favor of the manufacturer.
Similarly, Burkett v. Loma Machine Manufacturing, Inc., 552 So.2d 134 (Ala. 1989), involved post-sale modifications of a "saw blade guard, increasing the exposed part of the blade from 15 to 30 inches," and resulting in injury to a user. 552 So.2d at 135-36. This Court affirmed a summary judgment in favor of the manufacturer, because the manufacturer had presented uncontroverted evidence that the alteration was substantial. 552 So.2d at 136. In this case, we cannot say that, as a matter of law, the machine was substantially altered within the meaning of the AEMLD.
In short, Horn has presented substantial evidence as to the elements of her AEMLD claim. Her expert opined that the machine was "defectively designed due to the foreseeability of the industrial customer to bypass the interlock circuit in the elementary method employed in the instant case" and that the accident could have been prevented had the machine been equipped with technology that was readily available when it was manufactured. Indeed, Cardinal concedes that the broken cutting tool "was allowed to escape the confines of the machine because the front door shields were open." Cardinal's brief, at 3. Thus, we turn to Cardinal's affirmative defenses.
b. Affirmative Defenses of Contributory Negligence and Assumption of the Risk
Cardinal argues that "[e]ven if [Horn] proved that the machine was unreasonably dangerous, Mitchell was contributorily negligent and assumed the risk." Cardinal's brief, at 20 (emphasis added). More specifically, it contends that "a reasonable machine operator would [have] heed[ed] the warnings posted on the machine and in the manual that explain the purpose of the doors and warn that they should remain closed and that the interlocks should not be bypassed." Cardinal's brief, at 21 (emphasis added). Consequently, it argues, "Mitchell acted unreasonably and assumed the risk associated with operating the machine while the doors remained open at such a high rate of speed." Id. (emphasis added). Thus, Cardinal addresses the warning issue in the context of its affirmative defenses. See Spain v. Brown & Williamson Tobacco Corp., 872 So.2d 101, 132 (Ala.2003) ("the presence of an adequate warning may be part of a defendant's assumption of the risk defense") (Johnstone, J., concurring in part and dissenting in part); see also Pitts v. Dow Chem. Co., 859 F.Supp. 543, 551 *75 (M.D.Ala.1994). However, in seeking a summary judgment on the affirmative defenses of assumption of the risk and contributory negligence, it advances the wrong legal standard.
"In order to establish assumption of the risk as a matter of law, the evidence must show that the plaintiff discovered the alleged defect, was aware of the danger, proceeded unreasonably to use the product, and was injured." Sears v. Waste Processing Equip., Inc., 695 So.2d 51, 53 (Ala.Civ.App.1997) (emphasis added). "`[T]he plaintiff's state of mind is determined by [a] subjective standard,'" not the objective standard of reasonability. H.R.H. Metals, Inc. v. Miller, 833 So.2d 18, 27 (Ala.2002) (emphasis added) (quoting McIsaac v. Monte Carlo Club, Inc., 587 So.2d 320, 324 (Ala.1991)). "Assumption of the risk proceeds from the injured person's actual awareness of the risk." 587 So.2d at 324. "The plaintiff must know that a risk is present and must understand its nature." Id.
"To establish contributory negligence as a matter of law, [as Cardinal seeks to do here,] a defendant seeking a summary judgment must show that the plaintiff put [herself] in danger's way and that the plaintiff had a conscious appreciation of the danger at the moment the incident occurred. See H.R.H. Metals, Inc. v. Miller, 833 So.2d 18 (Ala.2002); see also Hicks v. Commercial Union Ins. Co., 652 So.2d 211, 219 (Ala.1994). The proof required for establishing contributory negligence as a matter of law should be distinguished from an instruction given to a jury when determining whether a plaintiff has been guilty of contributory negligence. A jury determining whether a plaintiff has been guilty of contributory negligence must decide only whether the plaintiff failed to exercise reasonable care. We protect against the inappropriate use of a summary judgment to establish contributory negligence as a matter of law by requiring the defendant on such a motion to establish by undisputed evidence a plaintiff's conscious appreciation of danger. See H.R.H. Metals, supra."
Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 860-61 (Ala.2002) (emphasis added). Thus, assumption of the risk and contributory negligence as a matter of law are both subjective standards, focusing on the risk as known and appreciated by the plaintiff.
Therefore, when Horn insists that "a `general awareness of danger' is not sufficient to establish [that] the plaintiff assumed the risk of injury," Horn's brief, at 62 (quoting Bowden ex rel. Bowden v. Wal-Mart Stores, Inc., 124 F.Supp.2d 1228, 1235 (M.D.Ala.2000)), she is correct. Instructive in this connection is Campbell v. Robert Bosch Power Tool Corp., 795 F.Supp. 1093, 1099-1100 (M.D.Ala.1992) (applying Alabama law). In that case, William Campbell was injured when a "grinder disc sold by defendant Robert Bosch Power Tool Corporation (`Bosch')" shattered, sending a piece of the broken disc into his eye. 795 F.Supp. at 1095. "Although the disc bore a label instructing operators to `use guards and goggles,' Campbell . . . was not wearing eye protection at the time of his injury." Id. Campbell commenced an AEMLD action against Bosch, which asserted, among other things, the affirmative defense of assumption of the risk. Id. Campbell "move[d] for a partial summary judgment, arguing that Bosch [had] failed to generate a triable issue of fact concerning" that defense. 795 F.Supp. at 1095-96. Bosch presented evidence in opposition to the motion.
"In this regard, Bosch . . . offered evidence that Mr. Campbell had extensive *76 experience and training with power tools such as electric drills, bench grinders, sanders, buffing machines, power saws, and lathes. The evidence further indicate[d] that Campbell was aware of the potential of many of these devices to cause eye injury, and he owned a welding hood which he would wear to protect his eyes when he thought it necessary. Mr. Campbell admit[ted] that he was aware that swarf or grit kicked up by many of these tools, including the grinding and sanding tool in question, could cause eye injury, and he admits that he assumed that particular risk by not using a guard or goggles on many occasions, including the occasion of his injury.
". . . .
". . . Bosch offer[ed] evidence that Campbell ha[d] sustained four eye injuries prior to the date of the accident in question."
795 F.Supp. at 1099-1100 (emphasis added).
The court concluded that this evidence was "insufficient to raise an issue of material fact concerning assumption of the risk of harm from a shattering grinding disc." 795 F.Supp. at 1100. That evidence, said the court, "at most demonstrate[d] that Mr. Campbell was aware of a generalized danger of eye injury when using power tools, or . . . that he assumed the risk of having small particles of wood or metal striking his eye." Id. (emphasis added). According to the court, "[t]he danger presented by swarf or grit is different in kind and magnitude from the danger presented by a shattering disc, and Mr. Campbell's assumption of the risk of the former does not evidence his intent to assume the latter." Id. (emphasis added).
Nevertheless, the court ultimately held that Campbell was not entitled to a summary judgment on Bosch's assumption-of-the-risk defense. This holding was based on evidence indicating that Campbell owned a "Dremel `Moto-Tool' which serve[d] as a sander and grinder, [and] came with an owner's manual [that] Mr. Campbell admit[ted] to having read." 795 F.Supp. at 1099.
"The manual contained a number of admonishments for users to wear safety glasses, such as: `The operation of any power tool can result in foreign objects being thrown onto the eyes, which can result in severe eye damage. Always wear safety glasses or eye shields before commencing power tool operation.' On the same page as two eye protection notices, the manual bore a passage which read:
"`!WARNING When using the steel saw wheels . . . or cutoff wheels . . . always have the work securely clamped. Never attempt to hold the work with one hand while using either of these accessories. The reason is that these wheels will grab if they become slightly canted in the groove, and can kickback causing loss of control resulting in serious injury. . . . When a cutoff wheel grabs, the wheel itself usually breaks. When the steel saw wheel grabs, it may jump from the groove and you could lose control of the tool.'"
795 F.Supp. at 1099-1100 (emphasis added). Because "the owner's manual which accompanied the Dremel Moto-Tool warned specifically that cutoff wheels `usually' break when they grab," and because "[b]oth [the Dremel Moto-Tool] and the one Mr. Campbell was using when he was injured appear[ed] to utilize high-speed rotating wheels, discs, or cutters to cut, grind, sand, or polish materials such as wood or metal," the court concluded that there was a triable issue as to whether the "tools [were] relatively similar, and *77 [whether] knowledge of the specific dangerous propensities of one tool could translate into specific knowledge regarding the other." 795 F.Supp. at 1100 (emphasis added).
According to Horn, "the best argument defendants can make is that Pam Mitchell might have had a general awareness of danger of a spinning part." Horn's brief, at 61 (emphasis added). Again, we agree. The evidence is not undisputed that Mitchell had a "conscious appreciation" or "actual awareness" of the specific danger made the basis of this action.
One sticker warned the user to beware of injury from "[f]lying objects from [the] machine." The remedies suggested for that danger, however, were the use of "safety glasses" and closed-door operation of the machine. The other sticker warned that "[c]utting tools can seriously injure or kill," but also counseled against operating the machine "unless [the] doors [were] closed and [the] interlocks [were] working." These stickers, either by themselves or in combination, do not form the basis for a summary judgment on the affirmative defenses of assumption of the risk and contributory negligence, and Cardinal's reliance on them is misplaced for a number of reasons.
First, it is clear that the use of safety glasses would have been immaterial in protecting Mitchell in this accident. In that connection, the deposition testimony of Procter, Mitchell's supervisor, is particularly relevant to the potential effect of these warnings. Procter, who stated that he had "somewhat" trained Mitchell, opined that the primary purpose of the warnings against open-door operation was to protect the machine operator from the discharge of coolant and small chips. More specifically, he stated that one "would want [the doors] closed" while operating the machine at "real high speed rates." At such times, "the chips would be flying up high, or the coolant swinging around, or you might cut out something that had a little thing on it, and [you might] not want it to fly out or stuff like that." He later reiterated that opinion, stating that, because the coolant "would come [out] and spray out over you [and] you would get soaking wet," the doors were to be closed primarily because of the "coolant and chips." Like "[t]he danger presented by swarf or grit" in Campbell, the danger presented by small chips and coolant spraying from the cutting area in this case "is different in kind and magnitude from the danger presented by a shattering [cutting tool]," 795 F.Supp. at 1100, and awareness of a "generalized danger" of eye injury or irritation from small chips and coolant  redressable with safety goggles  does not necessarily "translate into specific knowledge," id., of the possibility of a fatal injury from a flying tool.
Similarly, although one sticker, indeed, warned of potentially fatal danger from "cutting tools," the accompanying picture showed fingers being severed. Winston Hadley, "vice-president of operations" at SDS, testified by deposition that he interpreted the picture on the sticker as a warning not to "reach in there and grab hold of that cutter." Of course, this accident did not involve the intrusion of body parts into the cutting area.
Second, both stickers advised against operating the machine with the doors open. The closed-door aspect of these warnings is subject to a latent difficulty. Facially, these warnings purport to cover all operations of the machine. It is undisputed, however, that the machine was designed and manufactured to operate in two modes  automatic and manual  and that the interlock was designed to be operational only in automatic mode.
*78 Procter testified that  in his opinion  the closed-door warnings applied only to operation of the machine in automatic mode. During Procter's deposition, the following colloquy occurred:
"Q. [By Horn's counsel] [D]id you ever take notice also of the part of the sign that said do not operate unless doors are closed?

"A. [By Procter] You mean, did I see it when I read it?
"Q. Yes.
"A. Yes.
"Q. Had you ever informed your machinists or machine operators to not  before the death of Pam Mitchell  to not operate their [machine] with the doors open?
"A. Yes. I would tell them they need to close the doors when it was in automatic mode because the chips and stuff would fly out on them. You don't want to do that.
"Q. When it was in automatic mode?
"A. Yes.
"Q. What about when it was in manual mode?
"A. No.
"Q. Do you think that sign just made reference strictly to . . . automatic mode as opposed to manual mode?

"A. That would be my opinion.

"Q. What do you base that on?
"A. Just when youwhen you're in manual mode, there are certain things you perform with the doors open."
(Emphasis added.)
Procter further stated that the machinists at SDS, both before and after Mitchell's accident, routinely operated their machines in manual mode with the doors open. Indeed, his testimony suggested that some operations would be difficult, if not impossible, to perform with the doors closed. Hadley also stated that there were functions of the machining process that could not be performed with the doors closed.
According to Procter, the difference between operation in manual mode and automatic mode was characterized largely by the speed of the spindle. Operations in manual mode were properly performed at rpm on the lower end of the scale of 150 rpm to 10,000 rpm, while automatic-mode operation involved rpms on the higher end of that scale. However, the warning stickers made no reference to spindle speed. Because the machines were designed to be, and were, operated with the doors open at low speeds, Mitchell may have understood the closed-door warning, as did Procter, as applying only to automatic mode, and further, may have understood that the most relevant feature of the warning was spindle speed.
Although Procter testified that 4,000 rpm was a "more appropriate speed for . . . automatic mode" (emphasis added), he also stated that during his regular supervision of Mitchell, he never knew her "to operate her machine in . . . a manner [he] considered unsafe." Thus, Mitchell may have thought that the closed-door warnings did not apply to an operation at 4,000 rpm, that is, that it was safe to operate the machine at that speed with the doors open.
Finally, one sticker, to be sure, specifically warned against operating the machine without a functioning interlock. However, Procter, who had worked for SDS for 10 years at the time of his deposition, testified that the interlocks on the machines had not worked in years, "if ever." He and Hadley, who had operated a Fadal machine for a previous employer, each stated that he did not even know what an interlock was, or how it was supposed to work, until after the accident. *79 There was no evidence indicating that Mitchell had ever seen a user's manual for the machine she was operating. There was no evidence, therefore, indicating that Mitchell knew what an interlock was, knew that the interlock on the machine she was operating had been disconnected, or knew how the interlock might have affected her operation of the machine had it been functional.
Cardinal, which, in effect, urges us to hold that the warnings were adequate as a matter of law to apprise Mitchell of the danger as bases for its affirmative defenses of assumption of the risk and contributory negligence, has failed to present undisputed evidence of Mitchell's "actual awareness of the risk," McIsaac, 587 So.2d at 324, or her "conscious appreciation of the danger," Hannah, 840 So.2d at 861, of operating the machine at 4,000 rpm with the doors open. Consequently, it is not entitled to a summary judgment based on the affirmative defenses of assumption of the risk or contributory negligence.
c. Affirmative Defense  Product Misuse
Cardinal also argues that the accident resulted from misuse of the machine. Specifically, it contends that the cutting tool Mitchell was using was defective.
However, "`"[w]hen asserting misuse as a defense under [the] AEMLD, the defendant must establish that the plaintiff used the product in some manner different from that intended by the manufacturer. Stated differently, the plaintiff's misuse of the product must not have been `reasonably foreseeable by the seller or manufacturer.'"'" Sears, Roebuck & Co. v. Harris, 630 So.2d at 1028 (quoting Kelly v. M. Trigg Enters., Inc., 605 So.2d 1185, 1192 (Ala.1992), quoting in turn Edward C. Martin, Alabama's Extended Manufacturer's Liability Doctrine (AEMLD), 13 Am. J. Trial Advoc. 983, 1040 (1990) (emphasis added)). Foreseeability may be established by expert testimony. Halsey v. A.B. Chance Co., 695 So.2d 607, 609 (Ala. 1997). "Ordinarily, the plaintiff's misuse of an allegedly defective product is a factual issue for the jury." Harris, 630 So.2d at 1028. "Only `"[w]hen there is no genuine issue of material fact as to any element of an affirmative defense, . . . and it is shown that the defendant is entitled to a judgment as a matter of law"' is a summary judgment proper." Denmark v. Mercantile Stores Co., 844 So.2d 1189, 1195 (Ala.2002) (quoting Wal-Mart Stores, Inc. v. Smitherman, 743 So.2d 442, 445 (Ala.1999), quoting in turn Bechtel v. Crown Central Petroleum Corp., 495 So.2d 1052, 1053 (Ala.1986)). "`The movant's proof must be such that he would be entitled to a directed verdict if this evidence was not controverted at trial."'" Denmark, 844 So.2d at 1195 (quoting Ex parte General Motors Corp., 769 So.2d 903, 909 (Ala.1999)). In this case, Horn presented expert testimony that it was reasonably foreseeable that Fadal's "industrial customers [would] machine their own tools" and that such "tools [would not] necessarily be of the quality of those provided by the manufacturer." Because the issue of foreseeability is controverted, Cardinal has not met its burden on the affirmative defense of product misuse.

2. Negligence
Finally, Horn contends that Cardinal is guilty of negligence in the manner in which it inspected and serviced the machine throughout the period between its installation and the accident. Under this theory, as summarized by Horn's expert witness B.J. Stephens:
"Cardinal . . . breached its duties in this matter by its personnel not performing routine circuit box inspection during their visits and/or not following *80 any general safety checklist while on SDS premises. The performance of such, with appropriate notification to SDS and Fadal, would have likely modified SDS personnels' interlock bypass behavior in time to avert this tragedy."
However, Horn cites no legal authority relevant to her negligent-maintenance theory.
"Rule 28(a)(10), Ala. R.App. P., requires that arguments in an appellant's . . . brief contain `citations to the cases, statutes, other authorities, and parts of the record relied on.' The effect of a failure to comply with Rule 28(a)(10) is well established:
"`It is settled that a failure to comply with the requirements of Rule 28(a)([10]) requiring citation of authority for arguments provides the Court with a basis for disregarding those arguments:
"`"When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court's duty nor its function to perform an appellant's legal research. Rule 28(a)([10]); Spradlin v. Birmingham Airport Authority, 613 So.2d 347 (Ala.1993)."
"`City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala.1998). See also McLemore v. Fleming, 604 So.2d 353 (Ala.1992); Stover v. Alabama Farm Bureau Ins. Co., 467 So.2d 251 (Ala.1985); and Ex parte Riley, 464 So.2d 92 (Ala.1985).'
"Ex parte Showers, 812 So.2d 277, 281 (Ala.2001). `[W]e cannot create legal arguments for a party based on undelineated general propositions unsupported by authority or argument.' Spradlin v. Spradlin, 601 So.2d 76, 79 (Ala.1992)."
University of South Alabama v. Progressive Ins. Co., 904 So.2d 1242, 1247-48 (Ala. 2004).
"Authority supporting only `general propositions of law' does not constitute a sufficient argument for reversal." Beachcroft Props., LLP v. City of Alabaster, 901 So.2d 703, 708 (Ala.2004) (quoting Geisenhoff v. Geisenhoff, 693 So.2d 489, 491 (Ala.Civ.App.1997)). "`[W]here no legal authority is cited or argued, the effect is the same as if no argument had been made.'" Steele v. Rosenfeld, LLC, 936 So.2d 488, 493 (Ala.2005) (quoting Bennett v. Bennett, 506 So.2d 1021, 1023 (Ala.Civ. App.1987) (emphasis in Steele)). Because Horn has cited no legal authority specific to her negligent-maintenance claim, she has not presented an argument sufficient for reversal of the judgment on that claim. The judgment in favor of Cardinal is, therefore, affirmed as to the negligent-maintenance claim.

III. Conclusion
In summary, the judgment in favor of Cardinal, insofar as it addressed the claim of negligent maintenance and negligent failure to warn, is affirmed. In all other respects, it is reversed. The summary judgment in favor of Fadal is, except for the negligent-failure-to-warn claim, reversed. The cause is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and SMITH and PARKER, JJ., concur.
SEE, J., concurs in the rationale in part and concurs in the result.
*81 SEE, Justice (concurring in the rationale in part and concurring in the result).
Although I do not entirely agree with the majority's rationale in Part II.B.1.a., concerning Horn's theory of liability under the AEMLD, as to the remainder of the opinion, I concur in the rationale, and I concur in the result.
NOTES
[1] Although the complaint contained a negligent-failure-to warn claim, Horn has made no such argument on appeal. Thus, we deem as abandoned any challenge to the summary judgment in favor of Cardinal and Fadal on this claim. Chunn v. Whisenant, 877 So.2d 595, 601 (Ala.2003); Tucker v. Cullman-Jefferson Counties Gas Dist., 864 So.2d 317 (Ala. 2003); Bettis v. Thornton, 662 So.2d 256, 257 (Ala.1995) (an argument not made on appeal is considered abandoned or waived).
[2] Procter is a defendant in this action; however, he is not involved in this appeal.
[3] That motion would now be a postverdict motion for a judgment as a matter of law. See Rule 50, Ala. R. Civ. P., amended effective October 1, 1995.